### SHANAHAN v. FELTMAN.

(Supreme Court. Appellate Division, Second Department. January 17, 1913.)

New Trial (§ 106*)—Newly Discovered Evidence.

Defendant should be granted a new trial, plaintiff's only witness, beside himself, having after the trial made affidavit that he did not see the accident, as he testified, though he afterwards made one that he did.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. § 224; Dec. Dig. § 106.*]

Woodward, J., dissenting.

Appeal from Special Term, Kings County.

Action by John J. Shanahan against Charles L. Feltman. From an order denying his motion for a new trial, defendant appeals. Reversed, and motion granted.

Argued· before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

Bertrand L. Pettigrew, of New York City (Joseph M. Gazzam and W. Lester Glenney, both of New York City, on the brief), for appellant.

I. R. Oeland, of Brooklyn, for respondent.

JENKS, P. J. The defendant appeals from an order that denies his motion made at Special Term for a new trial at Trial Term upon the ground of newly discovered evidence. The action is for negligence.

About midnight of April 25, 1910, the plaintiff, in attempting to cross a public street of the borough of Brooklyn, came to collision with the motor car of the defendant, and suffered personal injuries. He testified that he was run down by the car, which neither gave signal nor showed light. A man named Tunley, who was present some time near the scene of the accident, was called as a witness for the plaintiff. Tunley testified that he saw the car before the collision, coming fast; that it did not slacken speed; that he did not hear any horn blown; that he did not see any lights upon it; that the car struck the plaintiff; that it thereafter was stopped; and that he then ran to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the car and assisted in taking the plaintiff from the front of the car to which he had clung. The defendant and two companions in the car at the time of the accident were witnesses for the defense, together with the chauffeur. The testimony for the defendant is that the car was going at very moderate speed, as the pavement was wet; that the horn was blown about 100 feet from the crossing; that the car was lit; and that the collision was inevitable because of the sudden movements of the plaintiff.

Thus it appears that the question of negligence, in so far as it hung upon speed, signals, and light, was sharply contested. When I state that the first trial resulted in a disagreement of the jury and that, aside from the plaintiff, there was no witness called by him other than Tunley, who testified to the events prior to the collision or the circumstances of it, it is apparent that Tunley was a very material witness. And he was presented to the jury as a stranger to both parties and as a disinterested witness. Prior to the trials Tunley was seen by representatives of the plaintiff and made affidavit that he saw the plaintiff step from the sidewalk to attempt a crossing; that prior thereto he saw a car coming very fast; that it struck the plaintiff; that the wheels skidded; that no horn was blown; that he saw no lights that he could remember; that, after the car was stopped, he inquired of the chauffeur why the horn was not blown; and that the chauffeur was silent, and that he helped to put the plaintiff in the car. The second trial, had in April, 1912, resulted in a verdict for $13,000.

Shortly after that trial an alleged private detective approached the defendant, told him that he knew Tunley, that he had reason to believe that his testimony was false, and offered, if the defendant would employ him, to procure evidence of this falsity. The defendant employed this man, who thereupon, with two associates, proceeded in that employment. They gained or had gained the confidence of Tunley, who represented to them that the plaintiff had promised him $500 for favorable testimony, but had paid to him only $40. They induced Tunley to write a letter, addressed to one of their number, to the effect that, although the plaintiff had made this promise to him, he had received but $40 on account of his testimony, "which won the case, as Mr. Shanahan very well knows," that $400 was due, and in that letter he authorized the addressee to collect this balance, and to deduct $50 therefrom for collection. And "to facilitate collection," Tunley was induced to make an affidavit, said to be in his own handwriting, that, although he was present at the scene of the accident, he "did not see how the accident happened, but * * * first saw Mr. Shanahan after the automobile had stopped," and he "helped him off the fender"; that he had afterwards informed Mr. Shanahan that he had only seen that part of the accident after Mr. Shanahan had been struck; that Mr. Shanahan had said that, if Tunley would testify in his favor, he would make "it worth my (Tunley's) while," and had thereafter introduced him to a friend who promised him $500 for favorable testimony in the case. This letter and this affidavit were not presented to the plaintiff, but were turned over to the defendant

or to his attorneys. The tergiversations of Tunley were not ended, for the plaintiff upon the motion presented an affidavit from Mr. Bolen, a reputable affiant, that he, together with a companion likewise reputable, went to see Tunley in jail, who in conversation with that companion and in the affiant's hearing admitted that he had made the affidavit for the detectives in order to collect the $450 from the plaintiff, that he had no idea that it would be "sold" to the defendant, and that it was left practically blank so that the detectives might write in whatever they wished. And Tunley then reiterated that he had seen the accident, as he had testified at the trials of this case. And thereupon Tunley put these statements into the form of an affidavit. The companion of the said affiant, Mr. Bolen, makes his affidavit in corroboration.

The record is very voluminous. The affidavits are numerous. I have not attempted to marshal or to summarize all of them. But, stripped of all the surrounding circumstances, does not the witness out of his own mouth reveal himself? It may be quite true that he did not willingly make these self-contradictions under oath with the thought that the record thereof would confront him. But aside from whatever practices, not commendable and subject to scrutiny and suspicion, may have been used to hoodwink him, he stands forsworn. And it must be remembered these charges do not merely attack his character for truth and veracity, but trench upon the truth of his testimony upon the issues of this case. I believe that Mr. Shanahan, the plaintiff, was not a party to any conspiracy to have Tunley testify falsely, and did not promise, directly or indirectly, Tunley money or other consideration for his testimony. I think that he had no reason to believe that Tunley lied, if he did lie, when he testified that he was a witness of the accident. And I think that the plaintiff is not subject to any criticism for his relations with Tunley. There are many affidavits as to his excellent character. If Tunley did not witness the accident, it is plaintiff's misfortune that he has no witness thereof save himself. If Tunley did witness the accident, and tells the truth, it is plaintiff's misfortune that Tunley at times has recanted. But the crucial question in this case is whether this verdict should stand when the sole witness to the accident beside the plaintiff, called by the plaintiff, reveals himself as a juggler with the truth, and veers from one party to the other as he may market his evidence. Tunley undoubtedly was at the scene, but the questions in doubt are whether he came upon the scene after the accident or was an eyewitness to the accident, and, if he was the latter, whether his version of the accident is true. It seems clear enough that he sought to profit from the fact that he was on the scene, and that he realized that his testimony, as an apparently disinterested spectator, was urgent for the plaintiff. If he lied, he may have thought that none could detect him. If he told the truth, he may have thought that he nevertheless put the plaintiff under an obligation. And I do not doubt that Tunley, recognizing his importance, sought to solicit money from the plaintiff as a gratuity, as an enforced loan, and as blackmail under the threat of recantation. He gives his word the stability of a weathercock.

When I advise that there should be a new trial, I do not mean that it should be implied that I think that the plaintiff has not cause of action, and should not prevail. If my advice be taken by my Associates, the plaintiff is not deprived of his ultimate right if he possess it. He may prevail without Tunley, or despite him. The jury may decide, if Tunley reiterates his evidence, that he tells the truth. But whether the truth is in him can be best determined by a jury that can see him and can hear both him and his accusers, and sift out facts from this mass of self-contradictions.

In Barrett v. Third Avenue R. Co., 45 N. Y. 628–632, the court say:

"Motions to set aside verdicts as contrary to evidence, as well as motions for a new trial upon the ground of newly discovered evidence, are not governed by any well-defined rules, but depend in a great degree upon the peculiar circumstances of each case. They are addressed to the sound discretion of the court, and whether they should be granted or refused involves the inquiry whether substantial justice has been done, the court having in view solely the attainment of that end."

In Hammond v. Delaware, Lackawanna & W. R. R. Co., 140 App. Div. 810, 126 N. Y. Supp. 141, the court, per Smith, P. J., say:

"The evidence was to the effect that it was a very few minutes, except the evidence of this man Scott, and Scott himself had theretofore made an affidavit contradicting the evidence then given upon the trial. Inasmuch, therefore, as the plaintiff's case rested mainly upon this evidence, and the witness has retracted what he then swore to and shown himself wholly unworthy of belief, it became proper in the exercise of fair judicial discretion to grant a new trial."

In Bennett v. Riley, 82 App. Div. 639, 81 N. Y. Supp. 882, this court said:

"It is not easy to bring home the conspiracy or the perjury by the perusal of affidavits. The court should not be required to do this if there is another tribunal which can decide those questions after seeing and hearing the accused and their accusers face to face under the scrutiny of oral examination. It is no evasion of responsibility, but the desire to further justice, that impels us to send virtually these questions to a jury. * * * Out of such trial should come the truth. At least, there is no human tribunal so well adapted to elicit it. If our decision determined a right we might hesitate more than we do when we consider that it means nothing more than placing the parties as they stood before the trial."

See, too, Chapman v. Delaware, L. & W. R. R. Co., 102 App. Div. 176, 92 N. Y. Supp. 304. I do not ascribe blame to the defendant. He himself was a witness. If the testimony adduced by him was true, then Tunley did not tell the truth. His attitude was protestant. He was informed that proof was procurable, not by him, that Tunley testified falsely. That proof apparently was procurable only by employment of the informant. The defendant's alternative was to suffer under what he regarded was an unjust verdict for a large amount of money, subject to his right of appeal. He did appeal, and he did employ the informant. But it does not appear that he in any way was a party to the methods whereby the proof was put into his hands or into those of his attorney.

Finally, nothing can be found which in any way casts any imputation upon the attorneys and counsel of both parties. They are of the highest standing and repute at the bar, and above even hypercriticism for their conduct.

I advise that the order be reversed, with costs, and that the motion be granted. All concur, except WOODWARD, J., dissenting.