# COURT OF APPEALS,
## May 9th, 1916.

## THE PEOPLE v. ORESTO SHILITANO.

(218 N. Y. 161.)

(1.) MURDER—FACTS EXAMINED AND HELD THAT JUDGMENT OF CONVICTION AND ORDER DENYING MOTION FOR NEW TRIAL, ON GROUND OF NEWLY DISCOVERED EVIDENCE, SHOULD BE AFFIRMED—RECANTATION BY WITNESS OF EVIDENCE GIVEN UPON TRIAL—WHEN CONSIDERED AS NEWLY DISCOVERED EVIDENCE—WHEN INSUFFICIENT TO SUSTAIN MOTION FOR A NEW TRIAL—ALLEGED ERRORS IN ADMISSION OF EVIDENCE EXAMINED AND HELD THAT SUCH EVIDENCE WAS PROPERLY RECEIVED.

On examination of the facts on appeal from a judgment entered upon a verdict convicting defendant of the crime of murder in the first degree and from an order denying a motion for a new trial on the ground of newly-discovered evidence, the witnesses making affidavits on the motion having been orally examined and cross-examined before the trial judge, held, that the guilt of the defendant is plainly evident and no legal ground for granting a new trial is presented.

(2.) SAME.

Defendant having sought to impeach the testimony of a witness against him by her own affidavit, it was competent to show statements made by that witness shortly after the murder and before the trial as tending to substantiate her testimony at the trial.

(3.) RECANTATION BY WITNESS.

The action of the defendant's brother and his attorney in dealing with the witnesses is indicative of an effort to coerce witnesses and suppress evidence against the defendant. That such efforts may have some tendency to prove a consciousness of guilt seems to be a fair deduction, and, therefore, they were properly received in evidence.

(4.) SAME.

It was not error for the court to permit testimony that a witness for defendant had stated that she had received money from the defendant's mother. This witness had testified in contradiction of the testimony of her husband, who was a witness for the People, and the admission which she made had a direct bearing upon the issue as to whether her testimony had been prompted by corrupt means.

APPEAL from a judgment of the Court of General Sessions of the Peace in the county of New York, rendered March 6, 1914, upon a verdict convicting the defendant of the crime of murder in the first degree. Also, appeal from an order of said court, entered October 5, 1915, denying a motion for a new trial on the ground of newly-discovered evidence.

The facts, so far as material, are stated in the opinion.

*Martin W. Littleton, Owen N. Brown* and *Edward A. Gill Wylie* for appellant.

The court committed substantial error in admitting over defendant's objection the testimony of the witness Sellitto and the testimony of the witness Verno as to conversations with the brother of defendant. (Hamel v. B. H. R. R. Co., 59 App. Div. 135; Moore v. People, 53 N. Y. 639; McCoy v. Munro, 76 App. Div. 135; Wharton on Criminal Ev., §§ 748, 750.) The court erred in denying defendant's motion for a new trial. (Hammond v. D., L. & W. R. R. Co., 140 App. Div. 810; People v. Priori, 164 N. Y. 459.)

*Charles A. Perkins* and *Edward Swann, District Attorneys* (*Robert C. Taylor* of counsel), for respondent.

Evidence tending to show that a party has tried to suborn a witness is competent, as an admission by acts and conduct that his evidence is weak and his defense dishonest. (Nowack v. M. S. Ry. Co., 166 N. Y. 433, 437; 54 L. R. A. 592; Lacs v. Everard's Breweries, 170 N. Y. 444; Hoag v. Wright, 174 N. Y. 35.) The " new " evidence was wholly incompetent to secure a new trial. (People v. Priori, 164 N. Y. 459; People v. Patrick, 182 N. Y. 131; People v. Eng Hing, 212 N. Y. 373; People v. Becker, 215 N. Y. 126.)

SEABURY, J.:

The defendant appeals from a judgment entered upon a verdict convicting him of the crime of murder in the first degree and from an order denying a motion for a new trial. In June, 1915, this case was before this court. At that time the alleged newly-discovered evidence was in the form of defectively prepared affidavits and this court suspended its determination until such time as the witnesses making the affidavits referred to could be orally examined and cross-examined. (People v. Shilitano, 215 N. Y. 715.) Since that time evidence has been orally taken and considered by the trial judge. The present appeal, therefore, comes before us upon the original record and the supplemental record upon which the motion for a new trial is based. The deceased, for whose murder the defendant was convicted, was a police officer named Heaney. Almost at the same time that Heaney was shot one Rizzo and another police officer named Teare were shot and killed. It is an established fact that these three men were killed by the same hand. It is necessarily to be inferred, and the inference is not disputed, that the killing of the two police officers took place after the murderer had shot and killed Rizzo, and that these officers of the law were shot and killed to prevent their effecting the arrest of the murderer. It is undisputed, also, that these murders occurred on the 3d of May, 1913, at about 11:45 P. M. in front of No. 239 Mulberry street, in the city of New York. The manner in which these homicides were perpetrated attest the deliberation and premeditation which characterized the act of the actor. The only question in dispute relates to the identity of the murderer. The record gives us but little information as to the antecedents of those engaged in this tragedy. The defendant and Rizzo were young Italians residing in Mulberry street. Rizzo was about twenty-two years of age. The defendant was a young man of about the same age. All that appears in the evidence about his antecedents is that he had a poolroom, was

called "Paper Box Kid," and was the son of Michael Shilitano, who was the owner of several tenement houses in Mulberry street and the landlord of the premises in front of which the murders were committed. The only motive which could have actuated the murderer in killing Officers Heaney and Teare was to avoid arrest. Whether the defendant had any motive to kill Rizzo does not definitely appear from the proof given upon the trial, although in an affidavit made by. the witness Sellitto, which was offered in evidence for the purpose of contradicting that witness, it is stated that on the night of the murder the defendant's father was in the poolroom at No. 235 Mulberry street and that Rizzo and Sellitto struck him. In view of testimony to which reference will be made, that immediately before the shooting the father of the defendant gave a revolver to the defendant, this circumstance may afford some justification for an inference of motive. Nellie De Carlo testified that a few minutes before the murder she saw the father of the defndant hand the defendant a revolver. The significance of this testimony is greatly enhanced when we consider that the defendant's father was not called to the witness stand and made no denial of this inculpating fact. The failure of the defendant to call his father to deny this testimony of Nellie De Carlo justified the jury in drawing the inference that the testimony on this subject was true. We start, therefore, with the fact that Rizzo struck the defendant's father in the poolroom and that shortly thereafter the defendant's father is seen handing a revolver to the defendant. We cannot say that this occurrence referred to in the affidavit of Sellitto was not an adequate motive to have impelled the defendant to the commission of the crime. Whether or not this is so, is not of controlling importance as motive is not an essential element of the crime of murder. It is, however, a suspicious circumstance suggestive of a possible motive for the defendant to have killed Rizzo. Alone it would be unworthy of consideration for any purpose. In connection with the other

testimony to which reference will be made, it is at least entitled to the weight which I have indicated I attach to it. It is established by the evidence of Peroto who worked in the poolroom, that the defendant, his father and Rizzo were in the poolroom shortly before the shooting. The testimony of Peroto on this subject is in no way impeached or contradicted and is corroborated by other witnesses called by the People. Nellie De Carlo testified that she saw the defendant and later his father come from the direction of the poolroom. Sellitto, Verno, Chieffo and Morelli testified to having seen the defendant there. It is significant that in the testimony upon a motion for a new trial, these witnesses do not deny that the defendant, Rizzo and the father of defendant were in the poolroom a short time before the murder occurred. The father of the defendant was not called to deny the presence of these men in the poolroom at the time. This fact may, therefore, be deemed as established beyond doubt. Morelli testified that he saw Rizzo upon the street a short distance from the defendant, that he heard a shot and saw Rizzo fall and that he helped to carry him into the hallway of No. 235 Mulberry street. Morelli was evidently a reluctant witness. He did not testify that he saw the defendant fire the shot, but it is a necessary inference from what he said that the shot was fired by the defendant. Whatever the reason for his apparent reluctance, it is a fair inference from his testimony that if he had been actuated by a desire to make out a case against the defendant he would probably have amplified his testimony. The impression derived from reading his testimony is not that he was attempting to establish a case against the defendant, but rather that he knew more than he told and said what he did with great reluctance. Sellitto testified to having seen the defendant shoot when he was about ten feet away from Rizzo. On his re-direct examination he said that he saw the defendant shooting at the policeman, and saw a revolver in the defendant's hand. He also testtified that he saw the defendant

shoot the second policeman and observed the defendant running away after the shooting. Verno testified that he saw the defendant draw his revolver and shoot Rizzo. He did not testify to the shooting of the policemaan, explaining that he was afraid the bullets might go wild and strike him and that he ran into the grocery at No. 243. Chieffo testified that he heard a shot and upon turning around saw Rizzo fall to the ground and saw the defendant running away. He also testified that he saw the defendant shoot Officer Heaney. He did not testify to the shooting of Officer Teare although he said that he heard other shots. There was also evidence to show that the bullets that killed Rizzo, Heaney and Teare were 38-calibre bullets and that all came from the same revolver. I have briefly summarized the evidence given on behalf of the People upon the trial to establish the identity of the defendant as the murderer of these three men. The evidence offered on behalf of the defendant upon the trial was directed entirely to an attempt to impeach the credibility of the witnesses called on behalf of the People. It will be necessary to summarize briefly this impeaching testimony. Guiseppe De Carlo, the father of Nellie, and his son William both contradicted Nellie's statement that she looked out of the window before the shooting. Guiseppe insists that she did not go to the window until after the shooting and that then she went to the window looking out on Prince street and not to the window looking out on Spring street. If she went to the window after the shooting and not before, it is reasonable to suppose that she would go to that window that would afford her a view of the street from whence the noise of the shooting came and not to the window from which the occurrence upon the street would not be visible. In addition to this, the uncontradicted testimony and the photograph of the room show that there was a bed between the Prince street window and the interior of the room. Under those circumstances, especially if the testimony of the father is true that his two boys William

and Frank were then in this bed, it would seem to have been impossible for Nellie to have looked out of that window. It is not without significance also that the son Frank, who is said to have been in this bed at this time, was not called as a witness upon the trial. Nellie De Carlo testified that when her father learned that she had told the detectives of what she saw on the night of the murder he commanded her to say nothing to any person on the subject. Rosie Mento, a tenant of the defendant's father and janitress of one of the houses owned by the defendant's father, and Judith Amato, a tenant of the defendant's father, both testified that Nellie volunteered the statement to them that the police wished her to be a witness, but that she knew nothing about the defendant. Pepe testified that he met Nellie a day or two after the shooting and that she told him to tell his nephew Gambardella that she saw nothing of the occurrence. Suspicion was sought to be cast upon Morelli's testimony because although he was himself arrested on the night of the murder, he did not tell the police about the matter until February, 1914, after he had been locked up in the House of Detention. Morelli's explanation for his reticence was that he did not want to be held as a witness. Sellito was confronted by an affidavit which he had made at the request of one of the attorneys for the defendant, in which he stated that the defendant was not the man who had done the shooting. On re-direct examination Sellitto explained that he made the affidavit " because I was afraid." Sellitto's wife and mother testified that he had told them before the trial that the police officers had forced him to testify upon a threat that if he did not do so they would send him to prison. Sellitto himself contradicted the testimony of his wife and mother. The witness Verno had previously been convicted of burglary and also made an affidavit for an attorney of the defendant that he did not see either the defendant or Rizzo on the night of the shooting. Vitecca, the grocer, who had been a tenant of defendant's father

for over ten years, attempted to contradict the direct testimony of Verno that after the shooting he had come into his grocery store, by saying that he had put the lights in his store out at about 10:15. He admitted, however, that at the time of the shooting three or four persons ran into his store and he was unable to say that Verno was not one of them. Chieffo's testimony was sought to be weakened by pointing out that although the murder occurred in May, 1913, he did not tell the officers of the law until July 19, 1914, and that at one time he had told them he was not at the scene of the shooting. Chieffo's explanation was that he was afraid of being sent to the House of Detention and losing his job if he stated the facts. The above is an inadequate but suggestive summary of the conflicting contentions that were submitted to the jury and upon which the jury found the defendant guilty of the crime of murder in its first degree. If there was nothing more in the record than what has been outlined above there can be no doubt that it was sufficient to warrant the verdict of the jury. This evidence presented only a question of fact which was submitted to the jury with great fairness by the trial judge. The case upon this appeal is very much complicated by the fact that the defendant moved for a new trial upon the ground of alleged newly-discovered evidence. This motion was based upon the testimony of Nellie De Carlo, Morelli, Sellitto, Verno and Chieffo, the principal witnesses who testified on behalf of the People at the trial, and in their testimony all of these witnesses except Morelli repudiate the testimony which they gave upon the trial. It will be necessary later to consider their testimony with some particularity and also the testimony which was submitted by the People in opposition to the motion. At the outset of our task in considering this alleged newly-discovered evidence it is necessary to determine whether recantation by witnesses called on behalf of the People necessarily entitled the defendant to a new trial. The question must be answered in the negative, otherwise the

power to grant a convicted defendant a new trial rests not with the court but with the witnesses who testified against him upon the trial. (People v. Tallmadge, 114 Cal. 427.) In the case last cited the court said: "It cannot be said that, as a matter of law, a new trial should be granted whenever an important witness against the defendant shall make an affidavit that he committed perjury in his testimony; if that were so, justice would be defeated in many grave cases. * * * We have no doubt that a case might arise where an important witness had afterwards testified to having committed perjury, in which this court would hold, looking at the whole case, that a new trial ought to have been granted." Bearing in mind that the witnesses to crimes of violence are often of a low and degraded character and that after they have given their testimony they are sometimes influenced by bribery and other improper considerations, it is evident that the establishment of a rule which left the power to grant a new trial to a defendant to depend upon recantation by such witnesses would be subversive of the proper administration of justice. I do not wish to be understood as urging that the fact of recantation is not to be considered by the court in weighing the testimony upon which the defendant was convicted, but I wish to make clear the fact that recantation in and of itself does not necessarily require the court to order a new trial. Such being the case, whether or not a new trial should be granted must depend upon all the circumstances of the case, including the testimony of the witnesses for the People submitted on the motion for a new trial in which these witnesses recant the testimony which they gave upon the trial. In determining the weight to be given to the statements of these witnesses affirming the guilt of the defendant and recanting their testimony, we must endeavor to discern the motives which actuated them. If upon examination it should appear that their testimony upon the trial was given without any motive to falsify and that their statements recanting their

testimony were prompted by corrupt or unworthy motives, but little weight should be given to the recanting statements. There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character. It is suggested by the learned assistant district attorney that evidence of recantation upon the part of a witness is not newly-discovered evidence, but merely evidence tending to impeach or discredit a witness, and, therefore, not of the character which would justify granting a new trial, as the rules governing such motions have been declared by this court in People v. Priori (164 N. Y. 459) ; People v. Eng Hing & Lee Dock, 212 N. Y. 373) ; People v. Becker (215 N. Y. 126). In this contention the learned counsel for the People is in error. Evidence of recantation upon the part of a witness is not merely evidence which tends to impeach or discredit a witness. Its character is much more fundamental. If the recantation be true it may in certain cases destroy the basis upon which the judgment of conviction rests and under the ample power vested in this court in reviewing a judgment of conviction in a capital case might be sufficient of itself to justify the granting of a new trial. Nor can it properly be said that because the witness who now recants his testimony gave evidence upon the trial, the fact that he now repudiates his former testimony precludes proof of this fact from being regarded as newly-discovered evidence. It is not that the witness has been newly discovered, but the fact that he has recanted his testimony since the trial which makes that evidence newly discovered. The question, therefore, which presents the most perplexing issue in this case is whether the evidence of recantation which is presented is of such a character and weight as to justify this court in setting aside the judgment entered upon the verdict of the jury. It is necessary to analyze briefly the newly-discovered evidence presented upon the motion for a new

trial. The result of this analysis will be found to bear out the view previously expressed that recanting testimony is untrustworthy evidence. The affidavits were not made until a year after the trial. Nellie De Carlo's testimony is an extraordinary production. In it she states that she did not see the shooting and was asleep in bed at the time. In addition to this she says that the two detectives frightened her into giving the testimony which they desired. According to her story they slapped her and took her to a room in the grocery store and slapped her again. She asserts that at police headquarters " I began crying and they told me to sit in a chair. The chair suddenly shot up and I fell out. I fell unconscious on the floor. When I came to I was sore and bruised all over my body, as if I had been kicked." The detectives whom she accused testified denying categorically every charge which she made against them, and the police inspector who was present at the police headquarters also testified contradicting her statements. In addition to this, Vitacca, the grocer, testifies denying that the police officers struck her in his store as she now asserts. In addition to the denials of her extraordinary statements by the police officers and officials and by Vitacca, Mrs. Rose gave testimony which is undenied, in which she tells of a significant conversation with Nellie only two days after the murder. Mrs. Rose testifies that in May, 1913, she was in charge of a department in a store in which Nellie worked as an errand girl. She says that on May 5th, 1913, she noticed Nellie crying, and asked her what she was crying about, " and she said that she had seen a shooting on Saturday night, May 3d, 1913, in Mulberry street; that she had seen a man named Shilitano hand a gun to his son and then had seen the son shoot down a police officer. That she had also seen a large pool of blood and that she would never forget the occurrence." Inasmuch as the defense seeks to impeach Nellie's testimony and claims that she never saw the shooting the testimony of Mrs. Rose is competent as tending to sub-

stantiate the testimony given by Nellie at the trial. (People v. Katz, 209 N. Y. 311.) There is nothing to cast suspicion upon this testimony of Mrs. Rose. It is not denied by Nellie. It seems to us reasonable and probable. Bearing in mind that as Nellie testified upon the trial her father had commanded her to say nothing as to what she had seen and that her father and brother who are friends and tenants of the defendant's father both testified in contradiction of Nellie's testimony upon the trial and that the jury did not credit their testimony, we do not regard Nellie's belated affidavit and testimony as entitled to credence. The story she tells puts too great a strain upon our credulity and the manner in which she tells it arouses suspicion, which, when the other circumstances are considered, such as the statement she made to Mrs. Rose shortly after the murder, ripens into a conviction that her recanting testimony is false. The testimony of Morelli submitted upon the motion for a new trial does not contradict the testimony which he gave upon the trial. All that it is sought to prove by his testimony is that after the shooting and before the trial when this witness was brought to the district attorney's office the assistant district attorney asked him how he knew Shilitano had done the shooting and he said he did not know it, and that subsequently a detective had tried to get him to say that Shilitano had done the shooting. This testimony does not contradict the testimony which he gave upon the trial. Indeed it is significant that in his testimony upon the motion for a new trial he repeats that on the night of the murder he heard the shots and saw Rizzo fall, and that he saw Heaney's body lying on the street. He also declares in this affidavit that shortly before the shooting he saw the defendant standing on the street near No. 241 Mulberry street. In this affidavit Morelli gives as the reason for making it that he " felt sorry for the Kid (the defendant), but I have been more afraid of the law and no influence has been brought to bear on me except my own decision

to tell the truth, by John Shilitano or any one else." Notwithstanding the solicitude for the defendant and the cause of truth it is worthy of note that he does not disaffirm the testimony which he gave upon the trial, which while not identifying the defendant as the murderer in express language did so by necessary implication. The testimony of Morelli does not contain a recantation of his testimony given upon the trial. On the contrary, partly in express terms and partly by implication he reaffirms the substance of the testimony he gave upon the trial. The testimony of Sellitto on the motion for a new trial is the effect (1) that he did not see the defendant on the night of the killing, and (2) that the detectives influenced him to testify upon the trial. In so far as his testimony denies that he saw the defendant on the night of the shooting it recants the testimony which he gave upon the trial. In his testimony he reiterates that he saw Rizzo shot and says that he saw a man shoot him and two policemen. On the trial he clearly identified the defendant as the person who did the shooting. On this subject he merely says in his recanting affidavit: " This man I saw was about forty years old, heavy-set, and wearing dark clothes. I am positive it was not Oresto Shilitano, the Paper-box Kid, whom I had known by sight for some time." He amplified this statement in his testimony. Verno testified that he knew nothing of the shooting until the next afternoon and asserts that he was led to testify to the contrary by the detectives. This testimony recants the testimony which the witness gave upon the trial, and states that he had talked the case over " repeatedly " with the defendant's brother. In his affidavit he recites the following reasons as operating to induce him to make his recanting affidavit: " I was also somewhat frightened when I thought what might happen to me if Oresto (the defendant) went to the chair. No one made any threats to me, but I knew he had many friends, and they knew I had sworn to a lie, and I was afraid of what they might do. It was not only

that I was afraid of this, but my conscience troubled me very much." In view of the other proof offered in the case as to the efforts of the defendant's friends to induce the witnesses to maintain a favorable attitude toward the defendant, this statement is illuminating. According to his own affidavit he recanted his testimony not only because of the promptings of his conscience but because " I was afraid of what they (defendant's friends) might do." The reason assigned bears out the contention made by the People upon the trial, that the defendant's friends had terrorized the witnesses for the People. In so far as the recanting affidavits and testimony of Sellitto and Verno accuse the police officers of having improperly influenced them to testify upon the trial these statements are denied by the police officers whom these witnesses accuse. The affidavit and testimony of Chieffo submitted upon the motion for a new trial recants the testimony he gave upon the trial. Since he made the recanting affidavits and before the motion was decided he made another affidavit recanting his recantation. These recanting statements presented a question primarily for the trial judge who had seen and heard the witnesses upon the trial, to determine whether they were of such weight as to justify him in setting aside the verdict. His original order denying the motion certifies that he gave to the questions raised by these affidavits " due deliberation, and earnest consideration and reflection thereon." The decision that he rendered discloses that he did not dispose of the matter in any merely formal manner, but that he gave in that careful consideration which the gravity of the issue presented to him for determination required him to bestow . upon it. The opinion which the learned trial judge rendered upon the motion for a new trial shows the careful consideration which he gave to the important questions pending before him. He approached the consideration of these issues in a spirit of patience and industry, with an eye single to doing justice between the People of the state upon one side and the defendant

at the bar on the other.  In his opinion denying the motion for a new trial the trial judge discloses the effort that was made to explore and sift the reasons and motives actuating the witnesses., He concludes that the testimony of Nellie De Carlo as given upon the trial was in substance true.  He finds " that she was treated by all who were connected with the police department with kindness, and no suggestion was made to her by any one that she was to do or say anything on the trial that was false, unworthy or improper."

In relation to the testimony of Verno, Sellitto, Chieffo and Morelli the learned trial judge said:  " During the trial I was impressed that all of these witnesses were laboring under great fear lest they would incur, in giving testimony, the hostility of the neighbors of the defendant, whose father seems to have been considered a wealthy and powerful man in the Italian settlement in which they all resided."  The trial judge in his opinion also pointed out " that prior to the trial and since the trial vigorous efforts were unremittingly prosecuted by Johnny Shilitano (defendant's brother) to poison the wells of justice and that sinister means were used to involve these ignorant men in palpable contradiction and in that way to assist the defendant.  That rewards were held out to them and threats made to do them bodily harm if they did not make statements which it was desired that they should make."  Great weight should attach to the opinion of the trial judge upon a motion of this character.  His position upon the trial gave him all the opportunities for forming an opinion of the credibility of the witnesses that the jurors possessed.  In addition to this he had before him the conflicting affidavits and testimony presented upon the motion for a new trial.  He used his experienced judgment and gave the matter his "earnest consideration " and concluded that the verdict of the jury was right and ought to be permitted to stand.  Under the circumstances I think that this court should not interefere with the judgment.  In view of the

character of the evidence offered to impeach the judgment and the decision of the trial judge denying the motion for a new trial the case fails to present a situation in which this court should substitute its judgment for that of the jury and the trial judge. No legal ground for granting a new trial is presented. As I view the case, my conviction is in accord with that expressed by the jury. The examination of the record has carried to my mind a strong conviction of the guilt of the defendant. The bullets found in the bodies of the three murdered men were of the same calibre, and were so marked as to leave no doubt that they came from the same revolver. The defendant, his father and Rizzo had all been in the poolroom a short time before the shooting. It is inferable from the evidence that Rizzo struck the father of the defendant. Although one of the witnesses testified that she saw the defendant's father hand the defendant a revolver a few minutes before the shooting, the defendant's father made no denial of this testimony. The fact that the witness who testified to seeing the father give the revolver to the defendant, shortly after the occurrence, made a statement consistent with her testimony to a disinterested person, is itself corroboration of her testimony. The fact that the defendant was at the place of the shooting is re-affirmed by some of the witnesses whose affidavits and testimony the defendant submits upon the motion for a new trial. Another circumstance persuasive of the defendant's guilt is the effort made by those acting on behalf of the defendant to influence and even to intimidate those who they believe could testify against the defendant. The inference of guilt is strengthened also by the fact that after the murder the defendant remained in hiding and could not be found although all the known police methods for locating him were employed. The circumstance that these friends and agents of the defendant presented in advance of the trial affidavits from two persons who afterwards testified against the defendant that they were not at the scene

of the shooting and knew nothing of it, instead of strengthening the defendant's case seem to me to cast suspicion upon it. If these witnesses knew nothing of the facts it is a little strange. that they should have been asked to sign affidavits certifying to their lack of knowledge. The fact that great efforts were exerted to procure the affidavits suggests the inference that perhaps those obtaining them had reason to believe that those witnesses knew more than it was desired that they should disclose. Every witness called by the People was or had been a tenant, employee or friend of the defendant's father and some of them were shown to have been paid money by the defendant's mother. I am unable to come to any other conclusion than that these circumstances, in addition to the direct testimony which the jury believed to be credible, established the guilt of the defendant. The conviction to which the mind is necessarily led by this direct and circumstantial evidence is in no way shaken by the suspicious recanting statements made by some of the witnesses. Several alleged errors are urged upon our attention by the appellant, some of which are of such an unsubstantial character as to be unworthy of discussion. The others it will be necessary for us briefly to discuss. Upon the cross-examination of Sellitto it was shown that when he was taken to the Tombs on October 29th, 1913, to see if he could identify the murderer from among several men who were there lined up in front of him, he did not point out the defendant. There was also an attempt to prove that a police officer endeavored to induce him to point out the defendant. To meet this testimony Sellitto upon re-direct was asked by the People to give a conversation he had with the brother of the defendant and one of the defendant's attorneys. In answer to this question he said that the defendant's brother and his attorney had called on him in Tarrytown and told him " the only thing we want you to do is not to place your hand on the defendant." Upon the cross-examination of Verno an affidavit made by him was offered

in evidence upon the trial to the effect that he heard nothing of the shooting until the next day. Upon re-direct he was, asked for the conversation he had with the brother of the defendant before he made this affidavit and he said that the defendant's brother said to him: " In case they call you don't say nothing." It is earnestly urged that this testimony given upon re-direct examination was improperly received in evidence upon the trial. In view of the cross-examination to which each of these witnesses were subjected the court committed no error in allowing the questions upon re-direct examination to be answered. From the testimony given by the witnesses the jury was justified in inferring that the defendant's brother and the defendant's attorney in persuading Sellitto not to identify the defendant and in inducing Verno to say that he knew nothing of the occurrence, were acting on behalf of the defendant. The action of the defendant's brother and his attorney in dealing with the witnesses is indicative of an effort to coerce witnesses and suppress evidence against the defendant. That such efforts may have some tendency to prove a consciousness of guilt seems to be a fair deduction and, therefore, they were properly received in evidence. (Nowack v. Met. St. Ry. Co., 166 N. Y. 433, 443; Lacs v. Everard's Breweries, 170 N. Y. 444; Hoag v. Wright, 174 N. Y. 36, 46.) It is urged that the court received in evidence a conversation between the witness Morelli and the mother of the deceased Rizzo and that this was error. It is a sufficient answer to this objection to point out that the witness Morelli was not permitted to testify to such a conversaion. The court did permit him to say that he had had a conversation with Mrs. Rizzo but the conversation itself was not proved. In view of the fact that upon cross-examination it was brought out that Morelli had talked with some one it was proper for the People to show with whom he talked. It is further, urged that it was error for the court to permit an assistant district attorney to testify that the witness Angelina·

Sellito, the wife of the witness Sellitto who testified in behalf of the People, had told him that she had received money from the defendant's mother. Angelina Sellitto had testified in contradiction of the testimony of her husband, and the admission which she made as to money she had received from the mother of the defendant had a direct bearing upon the issue as to whether her testimony had been prompted by corrupt means. The evidence given upon the trial was ample to justify the verdict of the jury. The evidence offered in support of the motion for a new trial is unworthy of belief, and obviously comes from a polluted source. There were no errors of law which would justify granting a new trial. Notwithstanding the contradictions and recantations of some of the witnesses, the guilt of the defendant is plainly evident. I also desire to express my entire concurrence in the opinion of Judge CARDOZO. Under the circumstances disclosed I vote in favor of affirming the judgment of conviction.

CARDOZO, J. (concurring):

Three witnesses for the prosecution have stated under oath to the trial judge that their testimony upon the trial was false. It became his duty to say whether they were conscience-stricken penitents, or criminal conspirators to defeat the ends of justice. He has held them to be conspirators. Unless we can say that he was wrong, and that they were not conspirators, but penitents, we have no right to reverse his order. But I do not see how we can say that he was wrong. I do not understand that even the judges who think this judgment should be reversed, assert that he was wrong. Their view is that with such a conflict of oaths, he should have abandoned the search for truth, and turned it over to a jury. That would have been an easy avenue of escape from a solemn responsibility, but I cannot satisfy myself that along that avenue lay the path of duty. I think it was the duty of the trial judge to try the facts, and de-

termine as best he could where the likelihood of truth lay. That is the very reason why the statute authorizes him to compel the personal appearance of the affiants before him (Code Crim. Pro. § 465, subd. 7; People v. Shilitano, 215 N. Y. 715). I do not mean that to justtify a new trial, he must have been convinced—firmly or with a sense of certainty convinced—that the first story of the witnesses was false and that their new story was true. He might act upon a reasonable probability. But if, on the contrary, he was convinced that the second tale was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked (People v. Tallmadge, 114 Cal. 427; Parker v. Hardy, 24 Pick. 246, 249.) He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumph. He was charged with a responsibility to seek the truth himself.

In the fulfilment of that duty, the judge who heard and saw the witnesses has held that there has been an attempt by the defendant " to poison the wells of justice." We ought not to set aside that decision on the facts unless it is clearly wrong (People v. Becker, 215 N. Y. 126). At least one witness, Chieffo, has said that threats of murder were made to induce him to recant. He says that the threats came from the defendant's brother. The brother has not taken the stand, and Chieffo's testimony remains uncontradicted to this day. Verno, who did recant, was the defendant's friend and companion. They had served a term in the Elmira Reformatory under a joint judgment of conviction. Verno says that he was miles away from the scene of the shooting, and that the police induced him to name the defendant as the murderer. He admits that they did not put in his mouth any other part of his narrative. Yet he told a narrative beginning with the shooting of Rizzo, followed by that of Heaney, and followed finally by that of Teare, which in its succession of events is in accord with the tes-

timony of conceded eye-witnesses. When asked to explain this correspondence, his only explanation is the incredible one that he made up these statements " out of his own head." Nellie De Carlo denies to-day that she knew anything about the murder. She tells a tale of abuse by the police which is contradicted by all the officers as well as by other witnesses, and on its face is incredible. She says, for illustration, that when taken to the office of the police commissioner she was placed in a chair which suddenly shot up to the ceiling, and she fell down bruised and sore. Her present story is that she did not even hear the ambulance. She did not know that any murder had happened till the following day. Yet her father and her brother, who were witnesses for the defendant on the trial, admitted that she was at the window when the ambulance arrived, though denying that she was awake at the moment of the murder. Sellitto, who now recants, testified on the trial that the murderer was the defendant. It seems to be undisputed that the defendant on the evening of the murder wore a light suit of clothes. When first questioned by the police, at a time when he does not claim that he was a victim of duress, Sellitto said that the murderer wore a light suit. Now he says that the suit was dark, and that the murderer was a man about forty years of age. I think we can give no credence to this belated attempt to bring into the case another man, older than the defendant and differently clad. It is now shown that on the night of the shooting the defendant disappeared, that he was in hiding for five or six weeks, and that he surrendered himself as the result of a treaty between his brother and the police. At the time of his flight no charge had yet been made against him. Flight, even after accusation, is some evidence of guilt; but flight before accusation is persuasive evidence. The flight is unexplained. No one has told us why this defendant, if he had nothing to do with the murder, fled and concealed himself before there was opportunity

for a charge that he had anything to do with it. I cannot think of any explanation consistent with innocence.

There are many other incriminating circumstances. I make no attempt to marshal them. They have been analyzed in the opinion of my brother SEABURY, in which I fully concur. I am unable to say that the trial judge made a mistake when he held that he was dealing, not with an honest recantation, but with a criminal alliance to release a guilty man. I am, therefore, constrained to vote for the affirmance of the judgment.

HOGAN, J. (dissenting):

At about 11:45 o'clock in the evening of May 13th, 1913, in front of No. 239 Mullberry street in the city of New York, an atrocious crime was committed. One Rizzo, a man about twenty-two years of age, one Heaney, a police officer, and one Teare, a police officer, were the victims. The three persons named were shot, one immediately following the other, and all died as a result thereof. It is asserted by the People that the three men were slain by one and the same person.

The defendant was indicted and tried for the murder of Officer Heaney. The trial resulted in a conviction of murder in the first degree on the 6th of March, 1914. From the judgment of conviction an appeal was taken to this court. Pending that appeal, and between the 8th and 11th days of March, 1915, five witnesses called by the prosecution upon the trial, whose testimony the People relied upon for a conviction, severally made statements, which they subscribed and to the correctness of which an oath was administered, to representatives of the New York *World* at the office of that newspaper, in which statements (to which reference will be hereafter made) they in effect asserted that the evidence given by them upon the trial of the defendant was false. Upon an affidavit of counsel for defendant, referring to the statements, copies of the same, and an affidavit of a representative of the newspaper, applica-

tion for a new trial was made to the justice who presided at the trial. The motion papers asked that the witnesses be summoned before him for examination. The application was opposed by the People, and amongst other affidavits in opposition to the application, the district attorney presented an affidavit made by one Chieffo; one of the witnesses who had made a statement to the representative of the *World*, in substance that the evidence given by him upon the trial was true and the statement made by him at the office of the New York *World* was false and made through fear. The justice to whom the application was made denied the request to compel the attendance of the witnesses in court for examination and denied the application for a new trial. From the order entered appeal was taken to this court.

Immediately following the publication of the statement in the *World* the witnesses were separately taken to the rooms of the Bar Association in the city of New York, where they were severally interrogated at length by the assistant district attorney, and the statements then made by them were reduced to record by a stenographer. In April, 1915, the appeals from the judgment and order denying application for a new trial were brought on for argument. In June, 1915, for the reasons stated in our decision (People v. Shilitano, 215 N. Y. 715), we suspended a determination of the appeals to the end that opportunity be afforded defendant to renew the motion for a new trial in the manner suggested in the decision. Thereafter, and in July, 1915, subsequent to the interviews had by the assistant district attorney at the bar association, three of the five witnesses made affidavits in due form embracing the identical language embodied in the statements made to the *World*. Upon such affidavits, the affidavits of counsel for defendant and of James Robbins, verified in March, 1915, the verified statement of Chieffo, dated March 11, 1915, and all proceedings had in the case, application for a new trial was renewed. The appli-

cation was heard by the judge who presided at the trial; the five witnesses were brought before him and interrogated at length by the counsel for defendant and the assistant district attorney. The application was denied and the appeals are now before us upon the original record of the trial and the records of proceedings upon the applications for a new trial.

The evidence of the witnesses called by the People on the trial, briefly summarized, tended to show that defendant a few minutes before the shooting was in front of No. 241 Mulberry street; that defendant's father approached defendant and gave to him " something shiny " which defendant put in his right sleeve; that Rizzo, the first victim, had spent a part of the evening in a poolroom at No. 235 Mulberry street; that he left the poolroom a few minutes before the crime was committed, and walked north to a point in front of No. 239 Mulberry street where defendant met him and fired a shot at him; that Rizzo fell upon the sidewalk and his death was immediate; that Officer Heaney, who was doing patrol duty, was on the opposite side of the street; that immediately after the shot was fired at Rizzo the officer rushed across the street carrying his club in his hand and was about to strike defendant who had started north when defendant suddenly turned and shot him. The second officer, Teare, was coming south on the street, and as he reached the point where he met deefndant, the latter shot him and then fled into the hallway of the house where he resided with his parents, No. 241 Mulberry street, and escaped.

The jury gave credence to the evidence, notwithstanding certain contradictory statements made by the witnesses on cross-examination, and evidence of witnesses called by the defense tending to affect the credibility of at least one of the principal witnesses for the People, and found defendant guilty of the crime of murder in the first degree.

Evidence was introduced on the trial relating to incidental and collateral matters, such as the finding and identification of

the body of the officer, Heaney, the cause of death, comparison
of the bullets found in the bodies, etc. The remaining facts dis-
closed in the record which I have briefly summarized were ad-
duced from the evidence of the five witnesses, namely, Nellie De
Carlo, a young girl of about sixteen years of age, whose evidence
was of a damaging character to the defendant, Gennaro Sel-
litto, James Morelli, John Verno and Frank Chieffo.

In view of the careful review of the record which each mem-
ber of the court has made, I do not deem it expedient to enter .
upon an analysis of the evidence given upon the trial by the
various witnesses and comparisons of the same with the details
of the statements and affidavits made by them and their evidence
given upon the application for a new trial, which would result
in extending this opinion to extreme length. I shall refer only
to the same as briefly as possible to give expression to the views
I entertain relating thereto.

It is important first to consider the nature of the statements
made by the five witnesses to the representative of the New York
*World*, the manner in which the statements were secured and
the facts connected with the making of the same.

The affidavit of Mr. Robbins, a disinterested witness in the
proceeding for the new trial, is to the effect that Nellie De
Carlo accompanied by her father called at the office of the New
York *World* on March 7th, 1915; that he, Robbins, was as-
signed by the city editor to interview her; that thereupon Nellie
De Carlo told him what she had testified to on the trial of the
defendant and said that she did not tell the truth then and that
she desired to make a sworn statement to that effect.

Mr. Robbins, in order to thoroughly acquaint himself with
the history of the case and the testimony on the trial, requested
Nellie De Carlo to return to the office on the following day; she
did return on the following day and was questioned at length
by Mr. Robbins and Mr. Swope, city editor of the New York
*World*, for the purpose of eliciting from her all that she knew

in relation to the homicide. Mr. Robbins states that she was given every opportunity to state all she knew and her statement was incorporated in the affidavit which was read over to her and by her read over to Mr. Robbins, and then signed and sworn to by her; that she repeatedly both before and after signing the affidavit stated in the presence of Mr. Robbins and Mr. Swope that she freely and voluntarily told her story; that she knew she was confessing to perjury on the trial and was doing so of her own free will, unurged by any one but her priest.

Upon the trial Nellie De Carlo, who lived at No. 243 Mulberry street with her parents, on the third floor of a tenement two flights up, testified that from one of the front windows of her room on the night in question she saw the defendant on the sidewalk in front of No. 241 Mulberry street; that his father came along and had a brief conversation with defendant, and she saw the father hand something to defendant " shiny," which defendant put in his right sleeve; that she saw Rizzo come from the direction of Spring street, and when he was about five feet from the defendant the latter shot him; that Rizzo fell to the sidewalk; that she saw Officer Heaney run across the street, and the defendant turned around and in a swift manner shot him; that Heaney fell to the ground and the defendant started towards Prince street.

In the statement made by her to the New York *World* she asserted that at the time the crime was committed she was in bed and asleep, and saw no part of it; that she attended St. Patrick's Catholic Church on Mulberry street; that she had been to confession a number of times during the preceding year, but had been refused absolution because she had admitted she had lied about the shooting, and she had been told by her father confessor that she should go to a judge and make full confession, and that was the reason she was making the statement. She stated that the story she told upon the trial was induced by fear. This witness had been in the custody of the police de-

partment from the time of her discovery as a witness down to the time of the trial—a period of nine or ten months.

Nellie De Carlo was interrogated by the assistant district attorney at the Bar Association soon after her statement was made public, and was examined as a witness in this proceeding. Her evidence covers a number of pages of the record. A large portion of it is devoted to an examination upon the question of fear, intimidation, etc. She adhered to the statement that at the time of the shooting she was asleep in her room and did not see or hear anything connected with the shooting.

The affidavit of Mr. Robbins further discloses that he and other reporters were assigned by the city editor to make investigation to ascertain the other witnesses who had testified for the People on the trial of defendant; that these witnesses, Morelli, Verno, Sellitto and Chieffo were found and told by representatives of the *World* of what Nellie De Carlo had done and were asked whether or not they desired to make statements; that within a few days the parties named came to the office of the *World* and signed affidavits relating to the testimony severally given by them on the trial of the defendant; that before the affidavits were signed Mr. Swope, the city editor, Mr. Beazell, Mr. Hitchcock, and deponent (Robbins) questioned at length the witnesses for the purpose of eliciting from them the facts they knew surrounding the homicide and the testimony given by them upon the trial, and all the witnesses stated they came to the office of their own free will, and with the expection of Morelli all said they understood and realized that they were confessing to perjury on the trial; that they made the statements and affidavits because they did not want to see an innocent man put to death because of their false testimony.

John Verno testified on the trial that he saw Rizzo and defendant in the poolroom, No. 235 Mulberry street; that defendant left there about 11 : 45 P. M. and was followed by Rizzo, and soon thereafter by witness; that he saw defendant put his hand

in his back pocket, run into the street and shoot Rizzo, and the latter fell, and that he, witness, then ran into the grocery store at No. 243 Mulberry street.

In the statement made to the *World* March 9, 1915, and the affidavit made by him Verno deposed that on the night of the homicide he left home, No. 285 Mott street, and went to East One Hundred and Eighteenth street to visit his mother; that he remained there until 9 : 30 P. M., and then left there and arrived home about 10 : 30 P. M., went to bed and fell asleep immediately. The next afternoon he read of the homicide. He knew nothing further of the case until about the middle of June, when a detective ordered him to report the following day at the district attorney's office. He reported there, was interrogated for some time, denied that he knew anything about the crime, and was permitted to leave. Again, in February, 1914, he was intrerrogated by the assistant district attorney at length and was sent to the House of Detention; that the testimony he gave upon the trial to the effect that he saw defendant shoot Rizzo was false; that he was at home in bed and did not know a murder had been committed until the next afternoon. Upon examination in open court he adhered to the foreging statement.

Gennaro Sellitto testified on the trial that when Rizzo was shot, the defendant was about thirty feet distant from Rizzo; that defendant had an article in his hand that looked like a revolver. Sellitto said he heard a shot and an officer who came across the street fell to the ground, the second officer came down the street and defendant fired another shot, the second officer fell a moment later and defendant ran into the hallway of No. 241 Mulberry street. The witness was taken into custody that night as a witness and detained until May 14th, when he was released on one hundred dollars bail. On May 16th he made a statement to the assistant district attorney in which he stated he saw some man shoot Rizzo, but did not see the face of the man who did the shooting. June 8th he made an affidavit that

that man who shot the three people that night was not the defendant. To the *World* reporter his statement was in effect that while he witnessed the shooting that he was positive the defendant did not do the shooting, but the shots were fired by a heavy-set man about forty years of age, dressed in dark clothes; that he did not see defendant that night, and upon this investigation adhered to the same story. This witness was in the House of Detention about four months, and, as appeared from the testimony of his mother and wife, he claimed that attempts were being made to coerce him to testify against and identify the defendant.

Upon the trial the witness Morelli testified that he saw the defendant in the cafe off the poolroom, and he also saw Rizzo in the saloon next to the poolroom; afterwards he saw the defendant and Rizzo on the street; they were about twenty to twenty-five feet apart, and he, Morelli, was then facing toward Spring street; that he heard a pistol shot and did not know where the defendant was at the time, but he saw the defendant about five minutes before he heard the shot in front of No. 241 Mulberry street. At the time the shot was fired Rizzo was in front of No. 239 Mulberry street, and after the shot was fired Rizzo fell to the ground and the witness helped to carry him into the hall of the building at No. 235 Mulberry street. In his statement to the *World* and affidavit following, as well as upon the investigation, he stated he heard two shots fired; that when Rizzo fell after the first shot, he, Morelli, then ran towards the saloon, stopped in front of the poolroom, and not hearing any more shots fired went back and found the bodies of Rizzo and Officer Heaney on the street about ten yards apart. This witness at all times insisted that he did not see the defendant fire the shots and did not know who did the shooting. He was arrested, taken to headquarters and questioned that night, and later was examined on various occasions by the prosecuting officers.

Frank Chieffo, upon the trial, testified that he was about opposite No. 239 Mulberry street when he heard a shot, turned and saw Rizzo falling to the ground and defendant running up the street, saw Officer Heaney run across the street, heard another shot, saw a flash from the direction of defendant where he was close to the building about three feet from Heaney, saw Heaney fall and as he walked up street heard one or more shots.

March 11th, 1915, Chieffo in substance in a verified statement made at the *World* office, stated that on the night of the murder he was at a club of which he was a member at 324 East Fourteenth street, and remained there until after eleven o'clock when he started for his home, No. 242 Mott street. He described the route he traveled on his way home which did not include Mulberry street. He said he reached home a little before twelve o'clock, immediately went to bed and asleep, and did not learn of the murder until the following morning; that about the latter part of October he was taken to the office of the district attorney, and before that time he had not discussed the murder with any person, not even with the members of his family, except what he read in the papers. At the district attorney's office he told the assistant he did not know anything about the murder. He was then permitted to depart. Until February 3d he was not interrogated, but on the latter date a detective picked him up, and he was then coerced to say he saw the shooting and consented to do so. He was then taken to the office of the district attorney, where he made and signed a statement repeating what he said to the detective, and was then taken to the House of Detention, where he remained until after the trial. He stated that his testimony on the trial as to the shooting was not true; that the knowledge that he had sworn an innocent man's life away made him decide to do what he could to take it back, and the statement was made of his own free will, and he made the same uninfluenced by any person and assumed full responsibility for it, as well as any result arising from having made the same.

The affidavit made by Chieffo on April 2d, 1915, followed an interview had by him with the assistant district attorney, immediately following a publication of his verified statement appearing in the *World*, and was used in opposition to the application for a new trial upon the first hearing. In that affidavit he repeated the substance of the testimony given by him on the trial and deposed that all his testimony given upon the trial was true, and that the statement made by him at the office of the *World* was not true, but was made because of fear of the brother of defendant and of friends of the defendant. Upon the investigation he adhered to the facts stated in the last affidavit.

In the foregoing summary I have omitted a reference to the details of statements, affidavits and oral testimony bearing upon the question of the exercise of an improper influence on the witnesses due to the conclusion reached by me in this extraordinary case. On behalf of the defendant it is argued that without the testimony of the five witnesses the record in this case does not disclose sufficient evidence tending to connect the defendant with the crime for which he has been convicted; that threats, coercion and confinement in the House of Detention prompted the five witnesses to give false testimony against the defendant. Upon the part of the People it is asserted that relatives of defendant by threats and improper means coerced the witnesses to make statements and affidavits tending to show that they had testified falsely on the trial.

Of the five witnesses who testified against the defendant on the trial, all of them except Morelli (who did not undertake to identify the defendant and now emphatically states that the man who did the shooting was a man other than defendant) have testified or deposed that upon the trial of the defendant they testified falsely, and that they were guilty of perjury. They sought to palliate their crimes by claiming they were induced to commit perjury, thus charging other individuals with

the crime of subornation of perjury. On the other hand, it is asserted by the People that the witnesses testified truthfully on the trial and since then they have committed the crime of perjury and were induced to commit that crime by other individuals, who are thus charged with the crime of subornation of perjury. In the meantime the defendant is confined in the death house under sentence of death, and we are asked to detrmine at what particular time the witnesses referred to told the truth and incidentally what person or persons, if any, have been guilty of subornation of perjury.

The record in this case does not disclose that any acquaintance or relation existed between the defendant and Rizzo, or any reason or motive inducing the defendant to kill Rizzo. While motive is not an essential ingredient of the crime of murder in the first or second degrees, " intent " is essential to a conviction in either degree. As bearing upon the question of intent, motive or absence of motive may present considerations of the utmost importance; consequently the absence of evidence showing any relations existing between the accused and Rizzo was a pertinent and proper subject to be considered by a jury upon the question of the probability or improbability of the guilt of the defendant, especially so in a case where the question of identity is at issue. (People v. Dinser, 192 N. Y. 80.)

True, the defendant was not tried for the murder of Rizzo; still it is asserted by the People that the three men were murdered by one and the same person; that the murderer of Rizzo killed Officer Heaney to effect his escape from arrest for the murder of Rizzo. Such facts if established would tend to disclose a motive for the murder of Officer Heaney, but the killing of Rizzo and of the officer by the same person and the identity of the defendant as the murderer of Rizzo was not admitted. The identity of the murderer of Rizzo was a material fact in the case; thus the relations between Rizzo and defendant were an important and pertinent subject for consideration.

The record does not disclose evidence bearing upon the antecedents of the defendant. Upon the hearing of the application for a new trial, a witness called by the People, one Laboria Gambardella, a detective-sergeant at the time of the homicide, then active in the case on behalf of the People but no longer a member of the police department, testified to the effect that he lived in the neighborhood of Mulberry street at one time; that he was well acquainted with Rizzo and defendant and had seen them together and they seemed to be friends; that he never heard of any difference between them or between Rizzo and defendant's father; that Rizzo was a strike breaker and before he entered that employment he was a good boy, but soon after he was so employed he shot a man, ran into the subway and attempted to escape but was caught; that a short time before the crime in question Rizzo shot one Loretto, and Loretto after the crime in question was accused of having shot Rizzo; that Loretto and Nellie De Carlo were good friends. It should also be observed that the witnesses in question did not testify upon the trial as to the presence of any one of the other witnesses in Mulberry street at the time the murder was committed, so that the evidence of their presence there is dependent solely upon the testimony they separately gave relating to their movements that night. The defendant was presumed to be innocent. It was incumbent upon the People to establish his guilt beyond a reasonable doubt. That burden the prosecution assumed by the testimony of the witnesses named; the jury believed their evidence and convicted the defendant. The jurors were afforded an opportunity to look upon the witnesses and hear their testimony. What court or judge can fathom the minds of the jurors or speculate upon what basis they formed a judgment? What individual can say that the jurors did not reject the testimony of four of the witnesses and believe the story told by the girl Nellie De Carlo alone, or that the testimony of all the witnesses or only a portion of them was sufficient to convict the

defendant? The case is now surrounded with perjury and that confessedly admitted by four of the five witnesses (the one remaining not having identified the defendant as the guilty party), and to the crime of perjury is added charges of subornation of perjury by both sides. There is no escape from this conclusion. How, then, will the ends of justice be promoted? If the retraction of testimonw be true and the judgment against the defendant is enforced he will suffer the penalty of death for a crime for which he has not been legally convicted. If it be said that to permit witnesses, by statements under oath after a trial had, to confess their guilt of perjury and thereby enable one convicted of a crime to secure a new trial would establish a precedent which would enable them to trifle with the administration of justice, the fact remains that the Penal Law makes ample provision for such cases, and experience in that direction is apt to prove sad and expensive. In this case the witnesses are the individuals who in a major degree are trifling with the court; they are the parties who charge subornation of perjury, and they should be brought face to face with the defendant and the parties accused before the tribunal so well adapted to determine truth, the same tribunal the defendant was tried before—a jury—where all parties interested may be heard and their credibility weighed. Truth will ultimately prevail, and any individual guilty of a crime will finally answer for the same. The course suggested will promote justice and prove more satisfactory than to have this court enforce the death penalty in this case where the evidence is so conflicting that examination of the same must result in a variance of conclusion, or at least in the minds of some the existence of a reasonable doubt as to the particular time when the witnesses so susceptible to a willingness to commit perjury told the truth. This case is unique in its surroundings. Did it present a situation where beyond " reasonable doubt " bad faith was apparent, or where the evidence exclusive of that adduced from witnesses confessing per-

jury was sufficient to sustain a conviction, a different result than the one I recommend would no doubt follow.

Assume that the record in this case was in substance presented upon an application for a new trial in a civil action wherein the plaintiff had recovered a substantial verdict; would any trial justice permit a verdict to stand or hesitate to grant a new trial and send the evidence to the district attorney? Orders granting new trials upon less incriminating facts have been made and sustained.   (Chapman v. D., L. & W. R. R. Co., 102 App. Div. 176; O'Hara v. B. H. R. R. Co., 102 App. Div. 398; Hammond v. D., L. & W. R. R. Co., 140 App. Div. 810; Shananhan v. Feltman, 154 App. Div. 809.)   But few decisions are to be found in criminal cases, especially in this state; the following cases, however, sustain the principle which in my opinion should prevail: State v. Moberly (121 Mo. 604); Dennis v. State (103 Ind. 142); Mann v. State (44 Texas, 642); Bates v. State (32 So. Rep. [Miss.] 915); People v. Fridy (83 Hun, 240).

The assistant district attorney upon the argument of the appeals, with his usual fairness in the presentation of cases in this court, in his brief states: " It might be conceded for argument's sake that defendant upon the proceedings now argument's sake that defendant upon the proceedings now under review successfully impeached every one of the People's important witnesses, but even if he did the fact would avail him nothing.   MALONE, J., was not only justified but required to deny the motion under the Becker opinion, *supra*."

For the purposes of discussion, I do not assume that counsel by the use of the language quoted intended to concede that the record discloses that the defendant should necessarily succeed on this appeal.   His position, as I understand it, is that the new evidence, even if uncontradicted, was inadequate to bring about a new trial; that it produced no new facts and its sole tendency was to impeach or discredit the People's trial witnesses.   In

support of the proposition he cites People v. Priori (164 N. Y. 459; People v. Patrick (182 N. Y. 131); People v. Eng Hing (212 N. Y. 373); People v. Becker (215 N. Y. 126); People v. Schmidt (216 N. Y. 324).

The assistant district attorney upon the argument of the the decisions made by this court. The statements and affidavits of the witnesses were made subsequent to the trial and conviction of the defendant, consequently they did not exist and were not discoverable at the time of the trial. If the facts were uncontradicted, if they were true, is there a court of law that would permit a death sentence to be imposed. Such a determination would be unprecedented in this state. If the contention of the assistant district attorney be correct, this court was powerless to suspend the hearing of the appeal in the first instance and order a further hearing upon the application for a new trial. The fact that we assumed jurisdiction of the appeal from the order denying an application for the new trial and required further investigation to be made by oral examination of the affiants to enable us to reach a determination, is evidence of our conclusion that we had power to review any order made on the application adverse to the defendant, and that fact is emphasized when such determination was rendered after a full consideration of the brief of the assistant district attorney on the first hearing wherein is contained the same point he now urges and which he supported by argument based upon the cases of Priori, Patrick and Eng Hing.

In the same brief, counsel argues that the decision of a motion for a new trial involves the exercise of discretion; that this court will not interfere unless it finds that the discretion has been abused, thus conceding our authority to review the discretion of the court below. Lord MANSFIELD said: "Discretion when applied to a court of justice means sound discretion guided by law." The discretion to be exercised by a court or judge must ever be applied to promote the development

of truth and a promotion of substantial justice.  When we speak of the impeachment of a witness, we refer usually to the development of facts tending to affect his credibility or to show his character for truthfulness is bad.  The testimony of a majority of people called as witnesses it sought to be impeached or discredited not only by cross-examination but frequently by the production of witnesses who are called to testify to a different state of facts.  When we consider an appeal from an order denying a new trial in a case like the one at bar, we frequently find affidavits or depositions of parties or individuals other than the witnesses attacking the truthfulness of witnesses upon a trial by reason of previous or subsequent statements attributed to them inconsistent with statements they made on the trial.  It is of that nature of so-called impeachment we have heretofore spoken of, except in the cases of Eng Hing and Becker which within our reasoning are clearly distinguishable from the case at bar.  In the Eng Hing case two women, Florence Hong and Grace Mack were sworn as witnesses in behalf of the People.  The nature of the proceeding is described in the opinion of this court written by Judge WERNER and need not be refered to here.  The two witnesses named did not recant their testimony given on the trial, but, on the contrary, contradicted by affidavit the alleged impeachment of their evidence.  In the Becker case one Marshall, an important witness for the People (as stated in the opinion of Chief Judge BARTLETT), while intoxicated in the city of Philadelphia signed and verified a statement somewhat inconsistent with his testimony on the trial. Subsequently he repudiated the statement as being different from what he understood it to be, and this court, after a review of the entire evidence, sustained the decision below denying a motion for a new trial.

In the case at bar the witnesses retracted under oath the material facts testified to by them on the trial.  Such disavowal or recantation is not " impeachment " as contemplated

in the statute or by our decisions. Where witnesses under oath retract evidence given by them upon a trial their recantation and prior testimony are subject to a careful scrutiny, and if doubt be entertained as to the particular time the witnesses were truthful the doubt should, especially in a capital case, be resolved in favor of a defendant. The application for a new trial in this case is out of the ordinary. In view of the conflict of evidence, the danger of a greater evil should be avoided and the defendant should have the opportunity of meeting the question of his guilt before a jury qualified by observation and scrutiny to determine the truth or falsity of the charge against him. I recommend a reversal of the judgment and order and that a new trial be ordered.

COLLIN and CUDDEBACK, JJ., concur with SEABURY and CARDOZO, JJ.; HOGAN, reads dissenting opinion, and HISCOCK, J., concurs; WILLARD BARTLETT, Ch. J., taking no part.

Judgment of conviction and order denying motion for a new trial affirmed.