## Commonwealth v. Miller.

*New trial — Murder of first degree — Recantations of testimony by witnesses.*

1. Recantations by witnesses called on behalf of the Commonwealth do not necessarily as a matter of law entitle the defendant to a new trial. The question as to whether or not a new trial shall be granted on this ground depends on all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial, and a new trial will be granted only if the trial court, in the exercise of its discretion, determines that the recantations probably are true. Particularly is this rule applicable where the alleged false testimony may be eliminated without depriving the verdict of sufficient evidentiary support, and especially where the recantations involve confessions of perjury.

2. Recanting testimony is exceedingly unreliable, and it is the duty of the court to refuse a new trial when the court is not satisfied that such testimony is true.

3. In refusing a new trial to a defendant convicted of murder of the first degree for killing his wife, where certain of their young children, who had testified on the part of the Commonwealth, afterwards recanted as to portions of their testimony, the court said: "During the course of the trial we studied all the witnesses as they gave their testimony. Upon that study of the witnesses, and upon serious consideration of the affidavits in support of the motion for a new trial and the counter-affidavits, our judgment is that the testimony of these children, given upon the witness-stand in court at the trial, in so far as connected with the matters now in controversy, was the truth, and that the allegations contained in the affidavits in support of the motion for a new trial, in so far as those allegations are in conflict with their statements from the witness-stand in court, are false, and have been made at the instance and persuasion of somebody interested on behalf of the defendant. Under these circumstances a new trial ought not to be granted."

Motion for a new trial. O. and T. Fayette Co., Dec. T., 1921, No. 17.

*N. W. Rosenberg,* Assistant District Attorney, and *John Duggan, Jr.,* for Commonwealth.

*W. C. McKean* and *E. O. Tabor,* for defendant.

VAN SWEARINGEN, P. J., May 31, 1922.—The defendant, Elmer Miller, was convicted of murder of the first degree for the killing of his wife, Minnie Miller, at their home in Franklin Township, on Dec. 1, 1921, the defendant having shot his wife through the heart with a revolver, the bullet passing entirely through her body. The case is before the court now on a motion of the defendant for a new trial.

There was evidence by three of the younger Miller children, Robert, Eunice and Jacob, aged, respectively, nine, twelve and fifteen, who lived with their parents at the time Mrs. Miller lost her life, to the effect that early in the morning of the day of the killing, the defendant, in the kitchen of the home, threw a cup at his wife, which struck her in the upper part and left side of the forehead, causing the blood to start, knocked her down with his fist, broke plates over her head and kicked her under the table, and that when she called

2 D. & C.

for assistance, saying she was dying, the defendant said, "Die, bitch, die; that is what I want you to do," throwing a bucket of dirty water on her while she lay under the table, and, after requiring the children to take the cows out to the field, sent them off to school probably an hour earlier than usual, telling them that if they told anything on him, they never would tell anything else, and that on the previous Tuesday, in the kitchen, when the defendant went to wash his hands and found no soap, he said to his wife, "Bitch, where is the soap," and his wife said there wasn't any, although she said she had asked him to get some, and he replied she always was wanting something, and that she would get something she did not want, saying, further, "Bitch, I'll kill you before another week rolls around," or words to that effect. We do not mean to say that each of the three children named testified to all of these matters, but each of them testified to some of them, and some of the matters mentioned were testified to by more than one of them. Ewing Miller, aged twenty, another son of the defendant and the deceased, testified that he, too, heard his father tell his mother in the kitchen, on the Tuesday before his mother's death, at the time of the discussion about the soap, that she always was wanting something, and would get what she did not want, and that he would kill her before another week rolled around. He testified that, a month or so previous to that, he heard his father curse his mother, telling her that he was going to kill her and was not going to live with her any longer. There was evidence that for a number of years before Mrs. Miller lost her life, the defendant had been in the habit of calling her vile names and abusing her, beating her with his fists, or with a broomstick, or a poker, or a chair, or anything he could get hold of, or kicking her, and that the defendant had made many threats to kill his wife, and that she carried marks of his abuse upon her face and forehead and body much of the time, and there was evidence that the defendant's abuse of his wife had become worse since a woman named Laura Snyder, with whom the defendant admitted at the trial he had been having improper relations, had been coming to the Miller home. Anna Livingston, a married daughter of the defendant and the deceased, testified on the part of the Commonwealth, and another married daughter, Dora Hixon, testified on the part of the defendant. The defendant denied many of the allegations of the witnesses on the part of the Commonwealth, and testified that he shot his wife through fear, when she pointed a revolver at him and he thought she was going to shoot him. Only the defendant and his wife were in the house when the shooting occurred.

The reasons assigned in support of the motion for a new trial are, in substance, (1) that the verdict of the jury was not warranted by the evidence; (2) that after-discovered evidence proves that there was a clearly formed plan, of which Ewing Miller was cognizant and to which he was a party, to kill the defendant, Elmer Miller, either on Wednesday before the tragedy or on Thursday, the day the defendant killed his wife, and that it was in pursuance of that plan that the deceased wife of the defendant held the revolver in her hand which she aimed at the defendant at the time the defendant fired the shot that killed her; and (3) that since the trial and conviction of the defendant, Robert Miller, Eunice Miller and Jacob Miller have made affidavits that their father did not say to their mother on the Tuesday prior to the shooting, in connection with the soap incident, "Bitch, I'll kill you before another week rolls around," or anything of like meaning, and that the soap incident did not happen, but that they were persuaded to give that testimony on the witness-stand at the trial by Ewing Miller and Anna Livingston, who stated to them that unless their father was convicted of murder of the first

degree and executed, he would get out of prison and kill them, and that if the defendant was convicted and executed, his children would get their shares of his estate, estimated at from $15,000 to $20,000. The rule of this court relative to reasons for a new trial, grounded on after-discovered evidence, has not been complied with, in that there is no statement of the party's belief of the sufficiency of the after-discovered evidence to change the verdict, and we might refuse a new trial on that ground alone, but we shall not dispose of the matter on a technicality, but will investigate its merits.

1. The first reason was not pressed, is without merit, and does not warrant discussion.

2. Absolutely no proof has been offered in any way connecting the defendant's deceased wife with any plan by anybody to kill the defendant at any time, or showing that it was in pursuance of any such plan that she aimed a revolver at the defendant at the time the defendant fired the shot that killed her, if she did do any such thing, of which there is no evidence except the testimony of the defendant. There is evidence in the affidavits submitted that on the day the defendant killed his wife, his son, Ewing Miller, left his place of employment with a gang of men working on the Pittsburgh & Lake Erie Railroad, some miles from his home, and was gone about three hours, and that when he came back he stated: "I've got a box of shells in my pocket that I'm going to try out on the old son-of-a-bitch when I get home," meaning his father, about whom he had been talking in angered tones for several days. But it appears clearly that the statement quoted was made after the defendant actually had killed his wife, and there is nothing to connect the statement in any way with any issue involved in the case.

3. Robert Miller, Eunice Miller and Jacob Miller have made affidavits since the trial that the testimony given by them when on the witness-stand in court relative to the soap incident was perjured and untrue, and that they gave that testimony at the direction of Ewing Miller and Anna Livingston, to prevent the defendant from getting out of prison and killing them, as they allege they were told he would do if they did not so testify, and to secure a distribution of the defendant's estate among them, following the defendant's conviction and execution. One peculiar thing about the matter, however, is that an examination of the notes of testimony taken at the trial shows that Robert Miller did not say anything whatever about the soap incident, or any threat made by his father against his mother at the time the soap incident is alleged to have occurred, although his brothers, Jacob and Ewing, and his sister, Eunice, did testify with reference thereto. Robert's affidavit containing his explanation, in the form of questions and answers, as to why he testified falsely at the trial in regard to the matter mentioned, covers ten typewritten pages, while, as a matter of fact, he gave no testimony whatever at the trial touching the matter involved. The boy states in his affidavit that on the morning his father's trial began, his brother, Ewing, told him he better tell some lies on his father or his father would get out of jail and kill him, and with reference to the alleged threat that the defendant said to his wife at the time of the soap incident, "Bitch, I'll kill you before the week is out," the boy says "Ewing Miller told me to say those words," while as a matter of fact he did not make any use of those words in his testimony at the trial. He says, also, in his affidavit that his sister told him to tell a few lies or his father would come home and kill him, and that he thought she was telling the truth, and he wanted to save his own life, and that was why he told the lies on the witness-stand, and yet he made no reference in his testimony on the witness-stand to the matters now alleged to be lies.

2 D. & C.

In his affidavit Jacob Miller says: "The testimony that I gave at the trial, about the soap and about the threats by my father to kill my mother before the week was out, is false and untrue. I told this untruth on the witness-stand because Ewing told me it was the best thing to do. He told me it would be the best thing to do over in the court-room on the day of the trial. I had never heard of this soap trouble before, and it did not happen as I said it did and as Ewing said it did, on the witness-stand." At another place in his affidavit, answering a question, Jacob said: "My sister Ann and Ewing put me up to tell it on the witness-stand, and it was not true."

In one of the affidavits Eunice Miller said, in the form of questions and answers: "Q. When did you hear about the soap story? A. Up in Union-town, at Mr. Duggan's office. Q. Who told you about this? A. Ewing. Q. Is that soap story true or not true? A. Not true. Q. Did your daddy, on Tuesday before the killing, have any trouble with your mother about the soap and threaten to kill her? A. No, sir. Q. Did you hear your daddy say on Tuesday night, when he couldn't find the soap, 'Bitch, you're always asking for something; some day you'll get something you don't want; I'll kill you before the week is out?' A. No, sir. Q. Now, Eunice, did your sister Ann ever tell you that she would buy you some nice silk dresses and silk stockings if you told certain stories? A. Yes, sir; she told me to tell that about the soap, so my daddy wouldn't get out. Q. What did she say? A. She told me she would get me the best dress I ever seen. Q. And just what did your sister Ann say when she was talking about the silk dresses? A. She said, we'll have to get rid of that son-of-a-bitch, and we have got the best chance in the world now. Q. Did your sister Ann say anything, Eunice, about getting any money if your father was put away? A. My sister Ann said, if we got dad sent to the electric chair, we all will get the money that is coming to us."

There is other testimony along these same lines in the lengthy affidavits submitted. But in one of the affidavits, which was in the form of questions and answers, in reference to the discussion of the distribution of the money from the defendant's estate, following his execution, which affidavit appears to have been taken at the Miller home in the presence of Mrs. Hixon and the children, this appears: "Q. Jake, when was the first time you heard it? A. In here (the room where the killing took place), the day of the funeral— that you could hear all around here—as you walked in and out of the house. Q. Did you hear it, Mrs. Hixon? A. Yes, sir. Q. When? A. On Saturday and Sunday. Q. Did you hear it, Eunice? A. Yes, sir. Q. Eunice, did you hear it in the house on the day of the funeral? A. I heard them, Ewing and Ann." Yet no reference to any such conversation was mentioned by Mrs. Hixon, who testified at the trial in favor of the defendant. Is it conceivable that a son and a daughter, attempting to procure the crime of perjury to be committed in an attempt to convict their father of murder of the first degree for the killing of their mother, so that they could get the money from his estate, following his execution, would take the risk of discussing such a matter so boldly as indicated in this affidavit, and so openly on the day of the funeral of their mother that the conversation could be heard by those attending the funeral, as they walked in and out of the house? Such a thing is contrary to human experience.

Waiving the awarding and issuing of a rule on the Commonwealth to show cause why a new trial should not be granted, the district attorney and private counsel for the Commonwealth came immediately into court and filed counter-affidavits. Ewing Miller and Mrs. Livingston deny most positively all the allegations contained in the affidavits filed in support of the motion for a new

trial which reflect in any way upon them. They deny that they have done or said any of the unlawful things alleged by the younger children to have been done or said by them. The killing was on Dec. 1, 1921, and the trial of the defendant did not commence until March 20, 1922. The county detective makes affidavit that he visited the Miller home the day following the killing, when the defendant and the dead body of his wife still were in the room where the killing occurred; that he is familiar with the testimony given by the younger Miller children at the trial of their father, and that that testimony was practically, although a little more in detail, the same as the information given to him and the county coroner by the children on the day following the killing. The assistant district attorney, who assisted in the preparation of the case for trial against the defendant, states in an affidavit that about three weeks before the trial began, when he talked to Jacob Miller about the occurrences connected with the case, Jacob said he heard his father threaten to kill his mother two or three days before the shooting; and the stenographer in the office of the district attorney states in an affidavit that, at the time referred to by the assistant district attorney, she heard some of the children say to counsel for the Commonwealth that a couple of days before the shooting they heard their father say to his wife that he would kill her before another week rolled around. And Samuel McLaughlin, a life-long resident of the vicinity near the Miller home, filed an affidavit that on the Tuesday following the burial of the deceased, Jacob Miller told him that one evening about two days before the killing he heard his father quarreling with his mother, and heard him threaten to kill her before the week was over, and that, again, after Jacob Miller had testified before the grand jury, Jacob told him that he had not told the grand jury all he knew, that he had not told them about his father's threatening to kill his mother on the Tuesday before the murder was committed, because he had not been asked to give it, but that he certainly was going to tell it at the trial, whether he was asked to or not.

It was conceded by counsel at the argument of the motion for a new trial that the first time the three younger Miller children were brought to the office of defendant's counsel after the trial, they told what was substantially the same as the testimony which they had given on the witness-stand in court, which they thereafter told also at the office of counsel for the Commonwealth, and that it was later, when they were brought again to the office of counsel for the defendant, that they made the changed statements. And even after that they insisted to counsel for the Commonwealth that their testimony given in court was the truth, and that the reason they said later it was not true was because of the solicitations of friends of the defendant.

The trial of the case against the defendant lasted five days. During the course of the trial we studied all the witnesses as they gave their testimony. Upon that study of the witnesses, and upon serious consideration of the affidavits in support of the motion for a new trial, and the counter-affidavits, our judgment is that the testimony of these children given upon the witness-stand in court at the trial, in so far as connected with the matters now in controversy, was the truth, and that the allegations contained in the affidavits in support of the motion for a new trial, in so far as those allegations are in conflict with their statements from the witness-stand in court, are false, and have been made at the instance and persuasion of somebody interested on behalf of the defendant. Under these circumstances, a new trial ought not to be granted. "Recantation by witnesses called on behalf of the prosecution does not necessarily entitle defendant to a new trial. The question whether a new trial shall be granted on this ground depends on all the circumstances of

the case, including the testimony of the witnesses submitted on the motion for the new trial. Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury:" 16 Corpus Juris, 1188. And particularly is this true where the alleged false testimony may be eliminated without depriving the verdict of sufficient evidentiary support, which is the case here: 16 Corpus Juris, 1190. "Where, after conviction, the State's witnesses assert that their testimony at the trial was false, the accused is not, as a matter of law, entitled to a new trial, but a new trial will be granted only if the trial court, in the exercise of its discretion, determines that the recantation probably was true:" People v. Shilitano, 218 N. Y. 161. It was said by the court in the case last cited: "There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character." See, also, Com. v. Brady, 76 Pa. Superior Ct. 488.

We have examined State v. Powell, 51 Wash. 372, 98 Pac. Repr. 741, cited by defendant's counsel. But that decision does not change the view we take of the case before us. Other than the recanted testimony in that case, there was no evidence of the commission of the crime to submit to the jury. There was slight corroboration, but not such evidence as, standing alone, would justify a conviction and penal sentence. The case was one of rape, and the recantation was by the girl upon whom the rape was alleged to have been committed. And even then the refusal of a new trial was reversed by a divided court. And see Story v. State (Ga.), 110 S. E. Repr. 326.

And now, May 31, 1922, for the reasons stated in the opinion herewith filed, the motion for a new trial is overruled and dismissed, and a new trial is refused.

From Luke H. Frasher, Uniontown, Pa.