Tuckett v State of New York (2025 NY Slip Op 03099)

Tuckett v State of New York

2025 NY Slip Op 03099

Decided on May 22, 2025

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on May 22, 2025

No. 39 

[*1]Ali Tuckett, Appellant,
v
State of New York, Respondent.

Katie McCarthy, for appellant. 
Frank Brady, for respondent. 
New York State Association of Criminal Defense Lawyers, et al., Innocence Network, amici curiae.

HALLIGAN, J.

Claimant Ali Tuckett seeks to recover damages from the State pursuant to Court of Claims Act § 8-b, alleging that he was unjustly convicted and imprisoned. The Court of Claims concluded that he did not prove his innocence by clear and convincing evidence and dismissed his claim. The Appellate Division affirmed. Tuckett argues that the Court of Claims improperly relied on hearsay evidence, evidence outside the record, and an impermissible presumption about witness credibility. Seeing no reversible error, we affirm.
I
Tuckett's claim is based on his now-vacated 2011 conviction for sexual abuse of his minor cousin, for which he was sentenced to an 18-year determinate term of imprisonment. At the time of the alleged assault, Tuckett was 35 years old; his cousin, N.M., was around 11. The People's case against Tuckett relied primarily on N.M.'s testimony that Tuckett had sexually abused him. N.M.'s mother and aunt also testified against Tuckett.
In 2013, N.M. told his mother that he had lied about the sexual abuse. She eventually shared this information with a prosecutor, who immediately interviewed N.M. Shortly thereafter, the prosecutor sent a letter to Tuckett disclosing that N.M. had recanted the allegation of sexual abuse.
With this newly discovered evidence in hand, Tuckett moved to vacate his judgment of conviction pursuant to CPL 440.10 (1) (g)[FN1]. He supported the motion with a sworn affidavit from N.M., which stated that N.M.'s allegations against Tuckett "were completely false" and originally "came up when [N.M.] was asked by his mother or brother whether [Tuckett] had done anything to [him]." N.M. "said no and kept saying no," but when his brother "confronted [him] about finding what he thought was sperm on the bedpost," N.M. eventually "said yes to get [his brother] off [his] back." N.M. further stated that he "decided to come forward because [he] got tired of lying."
Upon receiving Tuckett's motion, County Court, before whom Tuckett's bench trial was conducted, held a hearing on the motion during which it heard testimony from N.M., his mother, and his brother. It then granted Tuckett's motion, apparently with some reluctance. In its brief order, County Court noted that it "previously found [N.M.] credible in his accusation against [Tuckett]," and that it was "troubled" by N.M.'s recantation and had "concerns about what is actually behind [his] about-face." But it "carefully observed [N.M.'s] demeanor" and concluded that his "insistence on [Tuckett's] innocence . . . cannot be said to be incredible on its face." Because Tuckett was convicted "primarily on the strength of [N.M.'s] testimony" and there was no "real proof establishing an improper motive for [N.M.'s] recantation," the court concluded that it was required to vacate the judgment of conviction against Tuckett and order a new trial. The People did not pursue the charges further, and the court dismissed the indictment.
The following month, Tuckett filed this claim against the State, seeking damages for unjust conviction and imprisonment pursuant to Court of Claims Act § 8-b. Tuckett needed to "prove by clear and convincing evidence" the remaining two elements of his claim: that "he did not commit any of the acts charged in the accusatory instrument" and that "he did not by his own conduct cause or bring about his conviction" (Court of Claims Act § 8-b [5] [c], [d]). He intended to develop evidence that several of his family members had been influenced to testify against him at the criminal trial because he purportedly failed a polygraph test, and so he hired an expert who would testify that the results were flawed and that an independent analysis showed his answers to the test were "strongly truthful."[FN2] At the State's request, the Court of Claims excluded that evidence on the ground that polygraph results are inadmissible at trial in New York and no exception to that rule applied. The court further stated that Tuckett's burden was to show actual innocence, not to critique the police investigation that led to his conviction.
The Court of Claims held a three-day virtual trial in February 2022. It heard testimony from seven witnesses: Tuckett, N.M., N.M.'s mother, the mother of Tuckett's son, two police officers involved in the initial criminal investigation, and the prosecutor. Although Tuckett had planned to have N.M.'s aunt testify about how the failed polygraph test impacted her criminal trial testimony, he decided not to call her once the court excluded evidence regarding the polygraph.
During the proceedings, several transcripts from the criminal trial and grand jury proceedings were marked and delivered to the court as potential impeachment materials. Tuckett objected to admission of non-party prior testimony on hearsay grounds, and most of those transcripts were not admitted. Ultimately, only three transcripts were admitted: Tuckett's criminal trial testimony, his deposition related to the section 8-b claim, and selected criminal trial testimony from a physician who had examined N.M. Although there was some confusion along the way [*2]about what had been admitted into evidence, the court confirmed at the close of trial that it understood what had been admitted and stated that it would "literally throw out" all the other documents.

The Court of Claims concluded that Tuckett failed to establish his innocence by clear and convincing evidence (Tuckett v State of New York, Ct Cl, May 19, 2022, Martin, J., claim No. 129488). Relying on the testimony of an investigating officer and the prosecutor, along with an inference based on the fact of Tuckett's conviction that the grand jury and criminal trial judge had found N.M. to be credible, the court determined that N.M.'s original accusations were "truth[ful]." It also determined, based primarily upon its assessment of the testimony from N.M. and Tuckett before the Court of Claims, that N.M.'s recantation was "not credible." Concluding that the evidence of Tuckett's innocence was "equivocal," the court dismissed the claim.
The Appellate Division affirmed in a split decision (222 AD3d 1348 [4th Dept 2023]). The Court rejected Tuckett's argument that the Court of Claims had improperly relied on evidence outside the record, concluding that there was sufficient evidence in the record to support each of the findings he contested. Although it agreed with Tuckett that the court had relied on hearsay evidence, it deemed the error harmless because the hearsay was not essential to the determination that N.M.'s recantation was not credible. Having identified no reversible error in the Court of Claims's order, the Appellate Division declined to disturb the determination that Tuckett failed to prove his innocence by clear and convincing evidence.
Two Justices dissented and would have reversed for two independent reasons (see id. at 1351 [Montour & DelConte, JJ., dissenting]). First, they were persuaded that the Court of Claims improperly and prejudicially relied on evidence outside the record. Second, they determined that the court's reliance on hearsay statements was not harmless. Thus, they would have reinstated Tuckett's claim and ordered a new trial.
Tuckett appealed as of right (see CPLR 5601 [a]).
II
Tuckett raises three challenges. First, he argues that the Court of Claims rested its determination that N.M.'s accusations were credible on inadmissible hearsay. Second, asserting that some of the court's findings of fact are not supported by record evidence, he argues that the court must have improperly relied on evidence outside the record. Finally, Tuckett argues that the Court of Claims erroneously presumed that N.M.'s recantation evidence was unreliable. We address each argument in turn.
A
Tuckett contends that the Court of Claims improperly relied on two out-of-court unsworn statements that N.M. allegedly made in 2011 to the investigating officer and the prosecutor. He identifies the following passage from the court's decision as the source of this error:
"Several pieces of testimony point to the truth of N.M.'s accusations: (1) after initially reporting the abuse to [the investigating officer], N.M. said he felt better because he didn't like keeping secrets from his mother and (2) N.M. expressed concerns to [the prosecutor] about his health and anatomy because of the abuse. It is unlikely that N.M. would have made this statement to [the investigating officer] or voiced concerns about his body to [the prosecutor] if he was lying about the abuse."
We need not decide whether the statements N.M. made to the investigating officer and the prosecutor are inadmissible hearsay. Even assuming they are, the key question is whether the error prejudiced "a substantial right of a party" (CPLR 2002; see also Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, CPLR 2002 ["The erroneous admission of improper evidence is harmless error, and thus not a basis for reversal, if there is reason to believe the outcome would have been the same even if the evidence had been excluded"]; Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 2002.02 [4th ed, Apr. 2025 update] [same]). We conclude that any reliance on these statements did not prejudice Tuckett.
Although the Court of Claims stated that the statements "point[ed] to the truth of N.M.'s accusations," it identified substantial additional evidence supporting its conclusion that Tuckett's proof was not clear and convincing. The court emphasized "the context of Tuckett's behavior" during the time in question and aspects of the recantation it found "unconvincing." It placed significant weight on N.M.'s "unusual demeanor," noting that in testifying about his recantation he had a "shockingly flat affect" and that he testified "as an adult to undo the wrong he presumably inflicted on Tuckett . . . without emotion or apparent remorse." The court likewise observed that N.M.'s mother "testified with the same flat affect and apparent lack of remorse as N.M." It found their lack of remorse particularly striking given that "neither N.M. nor [his mother] has ever apologized" to Tuckett. And the court explained that it [*3]lacked confidence in Tuckett's testimony because his memory of the events surrounding the incident was faulty and his explanations for his interactions with N.M. around that time sounded like "an afterthought excuse."
Beyond its observations of the testifying witnesses, several additional pieces of evidence supported the court's determination. For example, the court noted that N.M. "offered little explanation about what prompted" his recantation. It also inferred from N.M.'s mother's decision to wait "months" to inform the prosecutor of the recantation that she was "apparently unconvinced that N.M. was going to stick with this new story." Although the court considered Tuckett's alibi and his willingness to take a polygraph test after the incident, it found that evidence unpersuasive. Given the abundance of non-hearsay evidence supporting the court's conclusion, even if the contested statements are hearsay, the error was not prejudicial.
B
Tuckett also argues that the Court of Claims erred by making findings of fact based on evidence outside the record—specifically, N.M.'s grand jury and criminal trial testimony, N.M.'s aunt's criminal trial testimony, and the CPL 440 order, none of which were admitted into evidence. "It is elementary" that a fact finder may "not decide an issue upon . . . facts outside the record" (Central Hanover Bank & Trust Co. v Eisner, 276 NY 121, 125 [1937]), and we will reverse where a finding of fact lacks support in the record and the error engenders prejudice (see Matter of Hailey ZZ. [Ricky ZZ.], 19 NY3d 422, 430-431 [2012]; People v Brown, 48 NY2d 388, 394 [1979]). Having carefully reviewed the record in this appeal, we conclude that each of the challenged statements has record support.
Tuckett identifies three findings that he says were based on N.M.'s grand jury and criminal trial testimony. The first is the court's determination that there was considerable criminal trial testimony about N.M.'s eleventh birthday party held at a go-kart place. But in the Court of Claims, both Tuckett and N.M. testified at length about the go-kart party, including its timing in relation to the alleged abuse, and N.M. recalled that he had testified about the party during the criminal trial. Evidence introduced to impeach N.M. during his testimony in the Court of Claims also supports the second finding that Tuckett disputes, namely, that Tuckett showed N.M. photos of nude women. Contrary to Tuckett's assertion, the court was entitled to rely on that impeachment evidence as evidence-in-chief (see e.g. Kaufman v Quickway, Inc., 14 NY3d 907, 908 [2010]). There is also evidence showing that N.M.'s testimony was consistent during the grand jury and criminal trial proceedings, which is the third finding Tuckett challenges. The prosecutor, who prosecuted the criminal case once the indictment was returned, testified in the Court of Claims that N.M.'s testimony was consistent throughout the proceedings, and the court could infer that N.M.'s grand jury testimony was in accord since it resulted in an indictment.
Tuckett's efforts to show the court relied on N.M.'s aunt's criminal trial testimony to find facts about the alleged abuse are equally unavailing. Tuckett testified in the Court of Claims that he and N.M. had been playing video games in the bedroom on the relevant date, that N.M. ran out of the room crying, and that N.M.'s aunt saw that behavior. N.M. confirmed during his testimony that he and Tuckett were alone in the bedroom and that they "did occasionally keep the door closed." And in his deposition, Tuckett said that N.M.'s aunt confronted him after seeing N.M. crying. When Tuckett explained that he had beaten N.M. in a video game, she told him to "stop messing with that boy." The court could readily infer from this testimony that the aunt was disturbed.[FN3]
Nor are we persuaded that the court improperly relied on the transcript from the CPL 440 proceedings and the resulting order. In support of his argument, Tuckett relies on the following passage: "at the hearing on the motion to vacate the judgment in June 2015, it is evident that Judge Argento doubted the validity of the victim's recantation, stating, '[t]he Court is troubled by the developments in this matter because it previously found the victim credible,' and had 'concerns about what is actually behind [N.M.'s] about-face' (Claim, ex. F)." The quotation and citation make clear that the court relied not on the hearing transcripts, but only on the CPL 440 order itself, which was attached to Tuckett's claim as exhibit F. Courts regularly "take judicial notice of their own prior proceedings and records, including exhibits, even sua sponte after trial" (Musick v 330 Wythe Ave. Assoc., LLC, 41 AD3d 675, 676 [2d Dept 2007] [internal citations omitted]; see also Long v State, 7 NY3d 269, 275 [2006] [taking judicial notice of another court's records in a section 8-b action]). We see no error in the Court of Claims doing the same.
C
Finally, Tuckett argues that the Court of Claims erroneously presumed that N.M.'s recantation testimony is inherently unreliable. Its application of that presumption, he says, is reflected in the court's brief invocation of People v Shilitano (218 NY 161 [1916]). He asks us to clarify that Shilitano does not impose such a presumption and argues that we should reverse because the court applied the wrong standard.

Tuckett is correct that Shiltano does not establish an irrebuttable (or even a strong) presumption that recantation testimony is unreliable. Shilitano instead held that a court considering the weight to be given to original accusations and a subsequent recantation should consider, among other things, "the motives which actuated" the conflicting statements (id. at 170; see also e.g. People v Stetin, 192 AD3d 1331, 1333-1334 [3d Dept 2021] [setting forth a six-factor test to apply when considering recantation evidence], lv denied 32 NY3d 1178 [2019]).
The Court of Claims's decision does not reflect a misunderstanding of Shilitano. The court set forth specific reasons, based on its factual findings and "careful attention to the demeanor of the witnesses," to support its conclusion that N.M.'s recantation was not credible [FN4]. Because the court's passing reference to Shilitano does not show that it improperly applied a presumption of unreliability to N.M.'s recantation, Tuckett's final argument neither establishes a basis for reversal nor gives us reason to revisit our decision in Shilitano. In light of the foregoing, we further conclude that Tuckett's argument for reversal based on cumulative error fails.
III
A claimant who asserts a damages claim against the State under section 8-b must prove their innocence by clear and convincing evidence. That task "is certainly not a simple one" (Reed v State of New York, 78 NY2d 1, 11 [1991]). After hearing from and observing Tuckett and N.M., the Court of Claims determined that the accusations were credible and the recantation was not, and that Tuckett therefore failed to carry his burden. We see no reversible error in that decision.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

RIVERA, J. (dissenting):

N.M. recanted the allegations he made at 11 years old, that his adult cousin, claimant Ali Tuckett, sexually abused him. There is reason to believe N.M.'s recantation. No forensic evidence or eyewitness testimony confirmed N.M.'s accusation and claimant always maintained his innocence. N.M. has repeatedly explained that he initially lied because he felt pressured by his religious family to blame claimant when he was caught watching same-sex pornography. Five years after claimant's conviction, when N.M. was 16 years old, N.M. recanted because he said he felt guilty and was tired of lying.
At claimant's CPL 440 hearing to vacate his conviction, N.M. testified under oath before the same judge who presided over claimant's bench trial and who found claimant guilty of the alleged sexual abuse. N.M.'s renunciation of his prior allegation led the judge "in good conscience" to vacate the judgment of conviction, explaining that N.M. was not incredible and there was no proof of an improper motive for the recantation. The court subsequently dismissed the indictment after the prosecutor decided not to retry claimant. By then, claimant had been imprisoned for over five years.
Claimant sued New York State for his wrongful conviction, and at the civil trial N.M. again testified that claimant never sexually abused him. The State failed to directly counter that testimony. Nevertheless, the Court of Claims disbelieved N.M. and dismissed the claim, concluding that the evidence of claimant's innocence was equivocal. That was error. Claimant is entitled to a new trial because the court relied on matters dehors the record as "corroboration" for N.M.'s initial abuse allegations, relied on an outdated categorical presumption against recantation testimony, and overemphasized N.M.'s perceived "flat affect" during a virtual proceeding. I dissent.
I.
Factual Background and the Section 8 Petition for Damages Against the State
N.M. was raised by a religious family headed by his maternal grandfather, who was the pastor of a small church that consisted mainly of family members. The church espoused conservative views, including teaching that same-sex relations were sinful, and that watching same-sex pornography was "one of the worst sins."
Claimant is N.M.'s older cousin. Claimant's maternal grandparents adopted him after his mother's death, and he lived with the grandparents into his late teens. Claimant, who had previously pled guilty to drug possession, was the only member of the family who had been incarcerated. After his parole, claimant, then 35 years old, returned to live with his grandparents. He attended the grandfather's church four times per week and would go every day to his aunt's nearby home. The family ran a childcare center on the first floor of the house, so claimant would spend time on the second floor, playing video games with then ten-year old N.M. in N.M.'s bedroom.
Around this time, N.M.'s brother caught N.M. watching pornography and saw a white stain on N.M.'s bed, which he assumed was evidence that N.M. masturbated. The family members asked if claimant was to blame for N.M.'s conduct. Initially, N.M. said that nothing had happened. Eventually, however, to deflect attention from his pornography interests, N.M. gave in to the repeated questions and suggestions that claimant was involved and alleged that claimant sexually abused him. N.M.'s mother reported the allegations to the police, but N.M. did not think his accusation would lead to claimant's imprisonment.
Claimant maintained his innocence, waived his Miranda rights, and offered to take a polygraph test. Claimant asserted that, years later, he learned that the police misrepresented to him and to several family members that he had failed the polygraph.[FN1] He testified before the grand jury, continuing to deny wrongdoing and proclaiming his [*4]innocence. N.M., by then 11-years old, also testified before the grand jury, repeating that claimant sexually abused him. Claimant was indicted on five counts related to the alleged abuse. And although he understood that he was facing 25 years to life in prison, claimant refused plea deals offering one- or two-years' incarceration.
At claimant's bench trial the following year, N.M. repeated his allegations. The trial turned on this testimony, as there was no forensic evidence of sexual abuse. Nor was there any direct eyewitness evidence, although family members testified to observing the two together and N.M.'s aunt testified that one day she saw N.M. run out of claimant's bedroom crying. The judge found claimant guilty of two counts of criminal sexual act in the first degree, two counts of sexual abuse in the first degree, and one count of endangering the welfare of a child. The court sentenced claimant to 18 years' incarceration followed by 15 years' post-release supervision.
Two years after the conviction, N.M.'s mother asked him about what she perceived to be odd behavior, and N.M. told her that claimant never abused him and that he made up the accusation. His mother was shocked and feared that N.M.'s prior statements might be considered perjury. At his mother's direction, N.M. repeated the recantation to his grandfather. After a few months and following the death of the grandfather, N.M., now 15 years old, told the prosecutor that he made up the allegations about claimant. N.M. did not report that his brother caught him watching pornography.
A year later, N.M. testified under oath at claimant's CPL 440.10 hearing to vacate the conviction, presided over by the same judge who had found claimant guilty at the criminal trial. N.M. again testified that he made up the allegations and that claimant had not sexually abused him. He explained that he would have been more embarrassed to disclose that he had viewed pornography, especially same-sex pornography, than he was to falsely accuse claimant. The judge vacated the conviction and ordered a new trial based on N.M.'s recantation. The court found N.M. was not incredible and that there was no proof of an improper motive to recant.
Claimant sued the State of New York for damages from his wrongful conviction. To prevail under Court of Claims Act § 8-b, claimant had to establish "by clear and convincing evidence" that "he did not commit any of the acts charged in the accusatory instrument" underlying the conviction (Court of Claims Act § 8-b [5] [c]). Claimant, N.M., and his mother testified at a virtual trial before the Court of Claims. Claimant testified to his innocence, and N.M. and his mother testified about the recantation. N.M. also testified that he felt guilty when he looked at claimant at the CPL 440.10 hearing and during the Court of Claims trial. N.M. again explained that he came forward because he felt he had to "set things right" after having "put [claimant] in jail for nothing."
Several transcripts were admitted into evidence: (1) claimant's 2011 criminal trial testimony; (2) claimant's 2018 civil deposition testimony, wherein he again testified that he did not commit this crime; and (3) excerpts of the criminal trial testimony from a physician regarding her examination of N.M. Several other transcripts, however, were delivered to the court as potential impeachment materials but ultimately not admitted. These included the criminal trial transcript of N.M.'s aunt's testimony, as well as other transcripts from the trial and the grand jury. Nonetheless, at various points during the section 8-b trial, the Court of Claims mistakenly indicated that all transcripts had been admitted.
The court dismissed the verified claim, concluding that the evidence of claimant's innocence was equivocal. The court first rejected N.M.'s recantation, working from "the long-held presumption that '[t]here is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character" (quoting People v Shilitano, 218 NY 161, 170 [1916]). In addition to the presumption against recantation testimony, the court took into account what it considered to be N.M.'s weak justification for recanting, his mother's disbelief at his claim that he made up the abuse, and the prosecutor's and the CPL 440.10 hearing judge's observations about N.M.'s demeanor. The court further relied upon what it termed N.M.'s "flat affect" while testifying about his feelings of guilt and remorse. The court also noted that N.M. had not resumed a relationship with claimant, "barely seeing or speaking to him since claimant left prison."
The court also rejected claimant's testimony, noting that claimant did not sufficiently remember details about his time alone in the bedroom with N.M. Furthermore, the court found unpersuasive that claimant took a polygraph test and testified before the grand jury because, according to the court, "it is well known" that the test results are inadmissible, and it was likely that claimant would have been indicted even if he had not testified before the grand jury. And although claimant maintained that he was not at the house during the time of the alleged abuse because he was selling drugs elsewhere, the court considered this admission and claimant's overall criminal history as evincing claimant's determination to place his self-interests above others.
The Appellate Division affirmed dismissal of the verified claim (222 AD3d 1348 [4th Dept 2023]). Two Justices dissented on the grounds that the Court of Claims considered grand jury and trial testimony not in evidence, as well as inadmissible hearsay statements that went to N.M.'s credibility (see id. at 597 [Montour and DelConte, JJ., dissenting]). Claimant appealed as of right pursuant to CPLR 5601 (a). For the reasons I discuss, I would reverse and order a new trial.
II.
Evidence Outside the Record Relied Upon by the Court of Claims
Claimant argues, as he did below, that the Court of Claims relied on evidence outside the record. Claimant preserved his claims that the court erroneously relied on: (1) hearsay evidence of N.M.'s statements to the police and the prosecutor prior to claimant's criminal trial; and (2) the aunt's criminal-trial testimony.[FN2] The State responds that the court did not improperly rely on outside or inadmissible evidence. I conclude that claimant has established that the court erroneously relied on the hearsay and the aunt's criminal trial testimony and that these errors, alone or in combination, warrant reversal and a new trial.
A.
Hearsay Evidence of N.M.'s Out-of-Court Statements
I begin with the sole point of agreement between the majority and dissent in the Appellate Division. Specifically, all Justices agreed that N.M.'s out-of-court statements to a police officer that he felt better after disclosing the abuse and was concerned the abuse might affect his health constituted inadmissible hearsay (see 222 AD3d at 596; id. at 597 [Montour and DelConte, JJ., dissenting]). The Justices' dispute centers on whether the court relied on the statements. On that point, the Court of Claims was crystal clear: it relied on the hearsay as testimony that "point[ed] to the truth of N.M.'s accusations" against claimant. We, of course, must take the court at its word (see Baba-Ali v State, 19 NY3d 627, 636-637 & n 8 [2012]). Put another way, the court expressly stated that it relied on the hearsay to determine that N.M. initially told the truth when he asserted that claimant sexually abused him, which led the court to further conclude that N.M.'s recantation was not credible.[FN3]
This error was not harmless. It is well settled that "an error is only deemed harmless when there is no view of the evidence under which appellant could have prevailed" (Marine Midland Bank v John E. Russo Produce Co., Inc., 50 NY2d 31, 43 [1980]). In other words, an error is not harmless if it "could have affected the outcome of the trial" (Lifson v City of Syracuse, 17 NY3d 492, 498 [2011]). Thus, the key question is whether the only reasonable view was that the Court of Claims would have found N.M. credible but for the hearsay evidence (cf. Tyrrell v Wal-Mart Stores Inc., 97 NY2d 650, 651-652 [2001] [ordering a new trial where the prevailing party failed to establish admissibility of evidence under hearsay exception]). By its own statements, the court unequivocally relied on this hearsay in rejecting N.M.'s recantation. Thus, the error was not harmless.
B.
The Aunt's Criminal Trial Testimony
Claimant next asserts that the Court of Claims relied on unadmitted evidence of the aunt's criminal trial testimony. "It is elementary that a judge should not decide an issue upon personal knowledge of facts outside the record" (Central Hanover Bank & Tr. Co. v Eisner, 276 NY 121, 125 [1937]; see also Snediker v Orange County, 58 NY2d 647 [1982]; Alford v Sventek, 53 NY2d 743, 745 [1981]). Claimant points principally to the following statement concerning N.M.'s aunt:
"[N.M.] was alone in [a] bedroom with [claimant] with the door closed" and he "ran out of the room crying, which his [a]unt [ ] witnessed and testified about at the criminal trial. She was disturbed by this but [claimant] told her that it happened because he had beaten N.M. at a video game, a story N.M. repeated at the Court of Claims trial."
The Court of Claims could not have known the content of the aunt's testimony without reviewing the criminal trial transcript. The aunt did not testify at the section 8-b trial, nor was her criminal trial testimony admitted into evidence. However, the transcript was submitted to the court, giving the court ready access to its contents. Critically, the court found that N.M. and claimant interacted daily "behind closed doors" over several months. Yet, no one at the § 8-b trial testified that the door was always closed, including on the day N.M. ran out crying. Indeed, N.M. testified [*5]that no one had an expectation of privacy in his bedroom. He explained that the bedroom door had no lock, to reach any other room on the floor one would have to walk past his bedroom, and the room was above a childcare center the family ran down the stairs. Claimant did testify that the aunt "might have said something" at the criminal trial about N.M. crying, but also that he was "not 100 percent sure" of such testimony.
That the Court of Claims admitted confusion over what prior criminal trial testimony was admitted into evidence further supports the conclusion that the court relied on evidence outside the record. Indeed, we cannot be certain what the court actually relied upon to reach its conclusion that both N.M. and claimant were not credible, given that the court had difficulty tracking the admitted evidence.
Claimant states that he intended to impeach the aunt's prior testimony by calling her to testify and showing that she became concerned about his interactions with N.M. only after the investigators falsely represented that claimant failed a polygraph test. The Court of Claims concluded that the effect of any alleged misrepresentation occurred before claimant's conviction and was therefore irrelevant to the § 8-b proceeding. Claimant asserts that due to the court's ruling, he then changed his strategy and did not call the aunt. As a consequence, the court relied on the aunt's testimony without providing claimant an opportunity to rebut it.[FN4] Therefore, the Court of Claims' reliance on the aunt's trial testimony was prejudicial.
In sum, each error on its own requires reversal. Even if that were not the case, in combination, these errors prejudiced the claimant and require a new trial.
III.
Shilitano's Presumption against the Reliability of Recantations and Science to the Contrary in Child Abuse Cases
Claimant further argues that the Court of Claims deployed an outdated and refuted presumption against recantation evidence pronounced in Shilitano. Claimant asks that we overrule the presumption full stop or clarify that the presumption is not justified in child abuse cases. The State counters that the Court of Claims did not apply an irrebuttable presumption against N.M.'s recantation testimony but rather assessed N.M.'s credibility by reference to multiple factors. According to the State, Shilitano did not adopt a categorical presumption but rather acknowledged that recantation should be viewed with skepticism and assessed for reliability based on all of the circumstances of the case. The research supports claimant's assertion that recantation evidence should not be presumed inherently unreliable in child sexual abuse cases. Courts should reject a presumption against such recantations. Here, the Court of Claims assessed N.M.'s recantation working from a negative presumption, and as a result ignored plain indicia of N.M.'s reliability.
A.
In Shilitano, the defendant appealed his conviction for the murder of a police officer and the denial of his motion for a new trial based on newly discovered evidence. In support of the motion, defendant submitted recantation evidence of several of the prosecution's trial witnesses. In rejecting the argument that the mere fact of recantation entitles a defendant to a new trial, this Court made the following generalization about the character of violent crime witnesses:
"Bearing in mind that the witnesses to crimes of violence are often of a low and degraded character and that after they have given their testimony they are sometimes [*6]influenced by bribery and other improper considerations, it is evident that the establishment of a rule which left the power to grant a new trial to a defendant to depend upon recantation by such witnesses would be subversive of the proper administration of justice" (Shilitano, 218 NY at 169).
Shilitano and several of the witnesses were Italian-American, living in Manhattan's Little Italy, where the shooting took place. The Court's offensive statement is best understood as a product of its time—the early 1900s—when discrimination and bias against Italian immigrants in the City was prevalent.[FN5]
Even though the Shilitano Court reviewed various factors in assessing the recantations at issue in that case, it did so through the lens of the presumption against recantations. Thus, Shilitano and the courts applying its adverse presumption ground the analysis in the negative—the recantation is inherently unreliable—and assume that the original statement was accurate and truthful (see id. at 170 [explaining that courts must "endeavor to discern the motives" of both the trial and the recantation testimony but explaining that the latter is "untrustworthy"]; id. at 171-178 [analyzing the various testimony]; People v Wong, 11 AD3d 724, 725-726 [3d Dept 2004] [setting forth six factors for evaluating recantation evidence]; People v Stanton, 200 AD3d 1307, 1312 [3d Dept 2021] [describing recantation evidence as "inherently unreliable"]).
As amici argue, Shilitano's presumption is often misplaced when a witness who testified as a child to having suffered sexual abuse recants as an adult. Of course, child sexual abuse is all too real (see Nellenback v Madison County, - NY -, 2025 NY Slip Op 02263, *7 [2025] [Rivera, J., dissenting]). But there is an "overwhelming consensus" among psychological researchers that children are suggestible in ways that increase the risk of false abuse allegations (Stephen J. Ceci & Richard D. Friedman, The Suggestibility of Children: Scientific Research and Legal Implications, 86 Cornell L Rev 33, 36 [2000]). This suggestibility increases in high-pressure situations, such as when a parent, police officer, or lawyer questions a child. "If a child was never abused, but adults suspected that they were, and suggestively questioned the child about abuse, then one might observe non-disclosure, followed by initial denial (when the child was first questioned), followed by a disclosure (when the child acquiesced to suggestion)" (Thomas D. Lyon, Breanne E. Wylie, & Zsofia Szojka, Understanding Child Sexual Abuse Disclosures, Delays, and Denials, 4-5, in Child Sexual Abuse: Disclosure, Delay, and Denial [M.E. Lamb, I. Hershkowitz & M.E. Pipe, eds. 2d ed. forthcoming], available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5106305 [accessed May 2, 2025]). Consistent with this research, recantation appears "uncommon among sexually abused children" (Kamala London, et al., Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?, 11 Psych, Pub Pol & L 194, 217 [2005]). In other words, when those who testified as children do recant—and especially when they do so as adults or under less suggestive circumstances—there is good reason to take the recantation seriously. To treat such evidence as presumptively "untrustworthy" is mere judicial prejudice, at odds with the social-scientific consensus (Shilitano, 218 NY at 170). It is time that we abandon the presumption that in these cases an adult's recantation of their childhood testimony is inherently unreliable and instead assess recantations on the strength of the evidence, without first tipping the scales against them.
[*7]B.
The Court of Claims applied Shilitano's presumption of unreliability and accordingly failed to properly consider to the indicia of reliability supporting N.M.'s recantation. Although we generally defer to a court's credibility determinations, there is no basis to do so in this case, where the record contradicts the court's reasoning.
The Court of Claims first erred in discrediting N.M.'s motives for falsely accusing claimant of sexual abuse. These motives precisely track those that scholars have identified as underlying false abuse allegations by children. N.M. was an 11-year-old, raised in a religious family, when he was caught committing the terrible "sin" of viewing same-sex pornography. N.M. admits that he succumbed to pressure from his family to put blame on claimant and thus to deflect attention from his sexual interests. N.M. has steadfastly recanted his allegations.
The Court of Claims effectively failed to consider N.M.'s motive for recanting. The CPL 440.10 order vacating claimant's conviction—the same order quoted by the Court of Claims to support its determination—found no proof of an improper motive. And as the State concedes, the evidence suggests no such motive, even as it amply explains why N.M. falsely accused claimant years earlier. To the contrary, from the moment he recanted as a teenager, and ever since, N.M. has risked the ire of his family and prosecution for perjury. He has publicly acknowledged his shame for sending an innocent person to prison because, as a child, he wanted to avoid embarrassment. Yet the court dismissed N.M.'s desire to "set things right" after having "put [claimant] in jail for nothing" as a "weak justification."
Notably, the Court of Claims heavily relied on what it described as N.M.'s "flat affect" but failed to account for the possibility that this "affect" was due to N.M.'s inability to look at claimant as he admitted under oath that he had falsely accused him. Nor did the court consider that N.M.'s testimony was provided virtually and not in-person, which may have affected the quality of N.M.'s voice and tone.[FN6] The court also noted that N.M. had not communicated or contacted claimant, but N.M. testified to the difficulty of facing him, even years later and even after telling the truth.
Finally, it bears noting the Court of Claims concluded that claimant was not credible, in part, because of his criminal history. The court concluded that claimant's proffered alibi that at the time of the alleged abuse he was involved in criminal drug activity illustrated that claimant placed his interests above others. That defendant committed drug crimes does not establish that he sexually abused a child.
Contrary to the majority, the Court of Claims' failures are fatal to the decision below. The majority brushes aside the court's discussion of Shilitano as a mere "passing reference" and contends that the court "set forth specific reasons, based on its factual findings and 'careful attention to the demeanor of the witnesses,' to support its conclusion that N.M.'s recantation was not credible" (majority op at 11-12). But Shilitano's "presumption" was plainly the foundation for the Court of Claims' analysis. And in ignoring Shilitano's directive to consider " 'the motives which actuated' the conflicting statements" (id., quoting Shilitano, 218 NY at 170), the Court of Claims neglected the single most important indicium of reliability. We cannot overlook such grave errors.
[*8]IV.
Claimant was incarcerated for several years based on the testimony of N.M., who as a child alleged that claimant sexually abused him. N.M. recanted a few years after the criminal trial, explaining the personal reasons and the family pressures that led to his initial accusation and his recantation. N.M. feels guilt and shame; he cannot face claimant. Claimant seeks damages for the years he spent in prison, damages the Legislature allows if he establishes by clear and convincing evidence that he is innocent of the alleged abuse (see Court of Claims Act § 8-b [5] [c]). The Court of Claims concluded that he failed to meet his burden, but that decision is based on evidence not in the record and on a presumption contrary to the research on child sexual abuse recantations. Claimant is entitled to a new trial where the court will rely only the record evidence and assess N.M.'s recantation without assuming it is inherently unreliable.
Order affirmed, with costs. Opinion by Judge Halligan. Chief Judge Wilson and Judges Garcia, Singas, Cannataro and Troutman concur. Judge Rivera dissents in an opinion.
Decided May 22, 2025

Footnotes

Footnote 1: CPL 440.10 (1) (g) allows a court to vacate its earlier judgment on the ground that
"[n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence."

Footnote 2: The dissent accepts as true Tuckett's allegation that "the police misrepresented to him and to several family members that he had failed the polygraph" (dissenting op at 4). But the Court of Claims did not make that finding. And even if Tuckett had called an expert to offer a different interpretation of the polygraph, such testimony could not establish that the results were misrepresented to him and his family.

Footnote 3: The dissent's contrary view rests on the Court of Claims's statement that "the defense presented evidence of . . . daily interactions behind closed doors over a period of months" (see dissenting op at 10). But the court's specific, and more nuanced, findings of fact are supported by record evidence, including: "from late 2008 through about April 2009, Tuckett went every day to [N.M.'s] house" and "played video games . . . alone or with N.M. . . . often with the door closed"; "during the summer of 2009, Tuckett was with [N.M.] almost daily playing video games in [N.M.'s] bedroom, where they were frequently alone"; N.M. "was alone in the bedroom with Tuckett with the door closed when he was molested"; "from the beginning of 2009 through the summer of 2009," Tuckett was "often playing video games alone in the bedroom with N.M., with the door closed"; and Tuckett "frequented [N.M.'s] house and spent time alone with N.M. in his bedroom with the door closed."
And although the dissent criticizes the court for not "providing [Tuckett] an opportunity to rebut" the aunt's testimony (dissenting op at 11), the Court of Claims did not bar Tuckett from calling N.M.'s aunt. Tuckett himself stated that he chose not to call the aunt as a matter of "trial strategy."

Footnote 4: The dissent contends that the Court of Claims "failed to account for the possibility" that emotional or environmental factors may have influenced N.M.'s demeanor (dissenting op at 16). It is not our role to second-guess the fact finder based on such speculation (see e.g. Matter of Liccione v John H., 65 NY2d 826, 827 [1985]).

Footnote 1: The majority questions whether claimant could have proven this assertion (see majority op at 4 n 2). The State, however, has never contested that the police misrepresented the polygraph results, but rather argued only that any misrepresentation, even if proven, was irrelevant to establishing claimant's innocence.

Footnote 2: I agree with the majority that claimant's two other claims are without merit. First, evidence admitted at the § 8-b trial indicated that claimant had shown N.M. pictures of naked women, that N.M. had alleged that claimant had abused him around the time of N.M.'s eleventh birthday party, and that N.M.'s testimony before the grand jury and at the criminal trial was consistent (see majority op at 9). Thus, there is no basis to conclude the Court of Claims relied on external evidence when discussing these matters. Second, the Court of Claims did not rely on the CPL 440.10 hearing transcript in its decision but rather on the CPL 440.10 order, which was attached as an exhibit to the petition and was properly before the court (see id. at 10-11).

Footnote 3: Defense counsel objected to the hearsay evidence and the Court of Claims overruled the objections. Thus, we may assess whether the Court erred in considering the hearsay (see e.g., Flynn v Manhattan and Bronx Surface Tr. Operating Auth., 61 NY2d 769, 771 [1984]; Meagher v Long Is. R. Co., 27 NY2d 39, 45-46 [1970]). The State's claim that the evidence falls within the state-of-mind hearsay exception is unpersuasive, as the court considered the statements for the truth of N.M.'s allegations of sexual abuse (cf. People v Ricco, 56 NY2d 320, 328 [1982]).

Footnote 4: The majority observes that claimant himself elected not to call the aunt to testify (see majority op at 10 n 3). That is irrelevant. We do not require parties to anticipate that courts might erroneously look outside the record.

Footnote 5: To say so is not to dishonor Shilitano's author, Judge Samuel Seabury. In the 1930s, following his judicial tenure, Seabury led what became known as the Seabury hearings, which investigated corruption in the municipal courts, police department, and district attorney's office. His investigations eventually led to the resignation of then-New York City Mayor James Walker. Earlier in his career, Seabury had been involved in reform politics, championing the single-tax movement of Henry George and railing against the corruption of Tammany Hall (see generally Historical Society of the New York Courts, Samuel Seabury, available at https://history.nycourts.gov/biography/samuel-seabury/ [accessed May 2, 2025]).

Footnote 6: The majority invokes the general proposition that we generally "afford[ ] great weight" to the trial judge's credibility determinations (Matter of Liccione on Behalf of Wendy A. v John H., 65 NY2d 826, 827 [1985]; see majority op at 12 n 4 [citing Matter of Liccione]). Even if that proposition were applicable here, grave risks attend credibility assessments based upon a witnesses' demeanor in virtual hearings (see Vazquez Diaz v Commonwealth, 167 NE3d 822, 842 [Mass 2021] [Kafker, J., concurring]).